CHICAGO, ROCK ISLAND & PACIFIC RAILWAY CO. et al. *v.* UNITED STATES et al.

No. 69. Argued October 14, 1931.—Decided November 23, 1931.

*Mr. Frank H. Towner,* with whom *Messrs. Alfred P. Thom, W. F. Dickinson, R. N. Van Doren, R. V. Fletcher, Herbert Fitzpatrick, George F. Brownell, C. C. Paulding, Ben C. Dey, F. Barron Grier, Edward S. Jouett, W. R. C. Cocke,* and *L. E. Jeffries* were on the brief, for appellants.

*Assistant to the Attorney General O'Brian,* with whom
*Solicitor General Thacher* and *Messrs. Charles H. Weston,
Hammond E. Chaffetz, Daniel W. Knowlton,* and *H. L.
Underwood* were on the brief, for the United States et al.,
appellees.

*Mr. Robert E. Quirk* for the South Manchester R. Co., appellee.

Mr. Justice Sutherland delivered the opinion of the Court.

This suit was brought in the federal district court for the northern district of Illinois to set aside parts of an order of the Interstate Commerce Commission made in a proceeding instituted by that body on its own motion. The purpose of the proceeding was to investigate ". the rules for car-hire settlement between common carriers by railroad in the United States for the use and detention of freight cars while on the lines of carriers other than their owners, with a view to making such order or orders in the premises as may be warranted by the record." All common carriers by railroad in the United States were made parties respondent. The Commission reopened and consolidated with the proceeding a number of cases theretofore pending before it, some of which had already been

heard and decided. Elaborate hearings were had, at which, generally, the trunk line railroads were represented by the American Railway Association, and the short lines, by the American Short Line Railroad Association. A large amount of testimony was submitted, together with several hundred exhibits. The Commission filed two reports. The first will be found in 160 I. C. C. 369–448, and the second or supplemental report in 165 I. C. C. 495.

The original report discussed the case and concluded with nine specific findings, the first of which follows:

" 1. Common-carrier railroads, whether subscribers to the per diem agreement of the American Railway Association or nonsubscribers, are entitled to receive reasonable compensation in the form of a daily rental for the use of their general-service freight cars when on foreign lines, and that the present per diem charge of $1 per car-day reasonably compensates car owners for average car ownership and maintenance costs. The reasonableness of this per diem rate is not questioned."

No order was then made, but the carriers affected were expected to conform to the findings and were left to modify their rules and practices accordingly. The carriers having failed and refused to do so, the Commission issued its supplemental report and entered an order giving effect to its findings, by which order the respondents in the proceedings before the Commission were required, on or before October 1, 1930, to cease and desist, and thereafter to abstain, from applying rules for car-hire settlements in conflict with those prescribed by the Commission's order, and were required to establish, on or before that date, and thereafter to maintain and observe, rules with respect to car-hire settlements which shall provide:

" (1) That the same daily car rental shall be paid to common-carrier nonsubscribers as respondents contemporaneously pay to subscribers to the per diem rules agree-

ment of the American Railway Association, for the use of general-service freight cars.

" (2) That similar reclaim allowances shall be made to nonsubscribers as to subscribers of the per diem rules agreement, in connection with cars handled in terminal switching service, as the latter term is defined by the switching reclaim rules of the American Railway Association.

" (3) That short-line railroads which are less than 100 miles in length, and which return railroad-owned equipment to the road from which received, shall not be required to report per diem accruals to numerous car owners throughout the country, but shall be attached to their connecting carriers for purpose of car-hire settlement.

" (4) That common-carrier railroads which interchange freight cars with more than one subscriber railroad, and which deliver to one or more subscribing carriers, freight cars which are received from another such carrier, and railroads 100 miles or more in length, regardless of the number of railroads with which they connect, shall make car-hire settlements direct with car owners in accordance with the per diem rules.

"(5) That common-carrier railroads outside switching districts, other than those referred to in paragraph 4 hereof, shall pay per diem to connecting carriers on railroad-owned freight cars after deducting an average of two days free time per loaded freight car interchanged, settlements to be made at the end of each calendar month, except that no car hire need be paid on cars received for return loading with coal from coal mines which are customarily dependent upon connecting carriers for car supply."

Thereupon, appellants, on behalf of themselves and other carriers similarly situated, brought this suit to set aside paragraphs (2), (3) and (5) of the order. No complaint was made in respect of paragraphs (1) and (4).

The case was heard by a court of three judges, constituted as required by the Urgent Deficiencies Act of October 22, 1913, 38 Stat. 220, U. S. C., Title 28, § 47. That court, without an opinion, made findings and conclusions sustaining the order of the Commission in all respects, and entered a decree of dismissal without prejudice to further applications to the Commission for modification of the order, if, subsequently, injury or unfair results follow from the application of the order.

In the early history of railroad operation, through freight was transferred from the cars of one road to those of the connecting line at junction points. This resulted in waste of time and money, and the railroads themselves soon adopted the practice of permitting the loaded cars to pass from their own tracks to those of the connecting roads, making a charge therefor. See In the Matter of Car Shortage, 12 I. C. C. 561, 573. For many years charges for interchanged cars were on a mileage basis, but this was found impracticable, and a per diem rate generally was substituted. Finally, an agreement was entered into, known as the "Car Service and Per Diem Agreement," which provided for an interchange of cars subject to a code of rules adopted by the American Railway Association, the general principle of which was that payment should be made to the car-owning railroad for each day the car was off its lines. The railroads subscribing to this agreement are known as "subscribers," and other roads, as "nonsubscribers." The subscribers, all members of the American Railway Association, comprise nearly 78 per cent. of the steam railroads in the United States; and these operate nearly 98 per cent. of the entire railroad mileage, and own 99.81 per cent. of all the railroad common carrier car equipment of the country. Carriers operating less than 100 miles of railroad are eligible for associate membership but without voting rights. At the time this case was heard by the

Commission, the per diem rate was fixed at $1.00 per car. The rules required daily interchange reports in respect of all cars interchanged between subscribers. Generally, nonsubscribers were railroads operating short lines and owning little or, in some cases, no freight car equipment. Provision was made in the rules for a "reclaim allowance," that is to say, a refund, to railroads which had paid car rental, to the extent of the per diem expense incurred in handling cars in terminal switching service. This rule was confined to subscribers, and no reclaim allowance was permitted to nonsubscribers for such service.

That the order of the Commission falls within the scope of its statutory powers is clear. Interstate Commerce Act, as amended by Transportation Act, 1920, c. 91, § 402, 41 Stat. 456, 476; U. S. C., Title 49, § 1 (10)–(14). Subdivision (14) provides:

"The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad subject to this Act, including the compensation to be paid for the use of any locomotive, car, or other vehicle not owned by the carrier using it, and the penalties or other sanctions for nonobservance of such rules, regulations or practices."

The authority of the Commission to institute the proceeding on its own motion, and to prescribe reasonable rules relating to the subject of car service, and to prescribe reasonable compensation for the use of the cars of one railroad by another railroad, is conceded. Nor is it disputed that under the law, in the operation of through routes, common carriers subject to the Interstate Commerce Act may be obliged to permit their car equipment to be carried beyond their own lines. See Missouri & Illinois Coal Co. v. Illinois Central R. Co., 22 I. C. C. 39. Appellants assail paragraphs (2), (3), and (5) of the order on the grounds

that their provisions operate to take property without compensation, are not justified by the evidence, and are discriminatory, unequal, arbitrary, and unreasonable.

*First—Paragraph (2).* Paragraph (1) of the order, which is not challenged, requires the same daily car rental to be paid to nonsubscribers as is paid to subscribers to the per diem rules agreement. Of this, paragraph (2) is the logical corollary. If nonsubscribers are entitled to be put on terms of equality with subscribers in the matter of liability for car rental payments, it is hard to see why they should not also be entitled to the same equality in respect of refunds of such portions of the payments as represent switching charges, provided, of course, that the nonsubscribers are also required to assume like obligation in respect of reclaim allowances when they in turn are owners of the used cars. The two paragraphs, taken together and fairly interpreted, we think justify the conclusion that the obligations imposed and the benefits to be received are intended to be reciprocal, and put subscribers and nonsubscribers, in respect thereof, upon terms of equality. That this is the view of the Government and of the Commission appears from the language of their brief, as follows:

" The Commission's obvious purpose was to place nonsubscribers on an equal footing with subscribers. The order is directed against all the common-carrier railroads in the United States, including both subscribers and nonsubscribers. The requirement that ' similar reclaim allowances shall be made to nonsubscribers as to subscribers ' can only mean that nonsubscribers and subscribers are to be treated alike. . . . The order in any event does not prevent appellants and the other subscribers from modifying the per diem rules so as to require nonsubscribers to pay such allowances to the subscribers. Since appellants can themselves cure the defect which they allege in the

.Commission's order, they are not in a position to challenge the order on this ground."

This virtually amounts to a construction by the Commission of its own order in accordance with the view we have expressed. The suggestion that in so far as the short line railroads can bring themselves within paragraph (5) of the order, this equality of treatment will fail, will be found to disappear when we come to deal with that paragraph.

*Second—Paragraph (3)*. This paragraph relieves the short line railroads of the class defined, i. e., those returning cars of other carriers to the road from which received, from the burden of reporting per diem accruals to numerous car owners, and in effect requires such reports to be made only to their immediate connecting carriers. The objection urged to the paragraph is that it requires the connecting carrier to expend its money in keeping accounts and making reports and payments in respect of operating expenses of the short line carrier, and thus amounts to confiscation in the guise of regulation.

The classification which results in exempting railroads less than 100 miles in length from the necessity of making reports of per diem accruals separately to each of the numerous car owners throughout the country is attacked as arbitrary and unreasonable. We think it is neither. It is of a kind frequently made and frequently upheld by this court. *St. Louis & I. M. Ry. Co.* v. *Arkansas,* 240 U. S. 518, 520; *Wilson* v. *New,* 243 U. S. 332, 354, and authorities cited. Moreover, the car equipment of the country is substantially in the hands of the trunk lines, that owned by the short lines being almost a negligible proportion of the whole. And this fact affords some additional ground for the classification. Indeed, the classification was recognized as legitimate by appellants themselves, when they subscribed to the provision that such short lines should be permitted to become associate mem-

bers only of the American Railway Association, but without voting rights.

Under the per diem agreement subscribers must report to each car owner as to cars used, and pay the per diem charges to such owner; but in the case of nonsubscribers—who are not bound by the rules—the reports and payments are made to the immediate connecting subscriber carrier. The effect of paragraph (3) is to extend this privilege to the subscribing short line carriers as well. In other words, all short line railroads, whether subscribers or not, are put in a separate class and relieved from the burden of keeping account of a multitude of separate per diem charges, and reporting them separately to the various trunk lines.

Each of the trunk lines already maintains a large accounting force, and is obliged to keep account of cars received from other lines, including those turned over to, and returned by, its connecting short lines. It fairly may be said that it will entail relatively little additional service to keep the accounts and make the reports, as required by paragraph (3). Each of these trunk lines in turn will be relieved from much of the burden and expense of dealing directly with non-connecting short lines; and it is not improbable that the benefits received will counterbalance the burdens, or at least go very far in that direction. On the whole, we are unable to conclude that this part of the order imposes upon the connecting lines anything of substance that as a matter of law constitutes a part of the work of operating the short lines, or that the required change adds anything to the operating expenses of such connecting carriers. On the other hand, as the record clearly shows, the keeping of these additional accounts, and the making of the vast number of reports to the numerous car owners throughout the country which would be required in the absence of paragraph (3), would put upon these short lines an excessive and disproportionate burden. It was estimated by one witness, and not

contradicted, that if the short lines were required to keep their accounts as they are kept by the trunk lines, it would impose an unnecessary burden upon the traffic of the country of approximately $500,000 per month.

The power to " establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad," conferred by subdivision (14) of section 1, hereinbefore quoted, undoubtedly includes the power to make reasonable rules prescribing forms and methods of accounting, reporting and distributing payments in respect of such service. The Commission is here dealing with the railroad system of the country as a whole. A multitude of interrelated interests is concerned. The trunk lines, as owners, furnish in the main all the car equipment used by the short lines. These are legitimate facts to be considered by the Commission in exercising its authority in respect of accounts; and these facts, and other facts and circumstances, justly may require that more of the clerical work shall be done by one of these classes than by the other.

The Commission is a body of trained and experienced experts, and in respect of such matters a reasonable degree of latitude must be allowed for the exercise of its judgment. The mere fact that, in application, mathematical accuracy in the adjustment of the burden may not be attained is not enough to put upon the Commission's order the stamp of invalidity. Primarily, the question is an administrative one, and unless the limits of reasonable regulation be transcended, the courts may not interfere. The Commission concluded that the circumstances afforded warrant for requiring that class of railroads which generally owned the cars, which was best equipped to perform the clerical work, and which would receive the most in the way of compensating and offsetting benefits, to perform a larger proportion of the service of keeping and rendering the accounts. In doing so, we are

of opinion that it did not transcend the limits of reasonable regulation, and that the claim of confiscation is not sustained.

*Third—Paragraph (5)*. This paragraph stands upon a different footing from those just considered. We do not find it necessary to review the various arguments made for and against the power of the Commission to make this part of the order. Section 1 (14), *supra,* authorizes the Commission to fix the compensation to be paid for the use of cars, etc., not owned by the carrier using them. This the Commission undertook to do, and expressly found that, whether subscribers or not, all common carrier railroads were " entitled to receive reasonable compensation in the form of a daily rental for the use of their general-service freight cars when on foreign lines, and that the present per diem charge of $1 per car-day " was such reasonable compensation. In so doing it followed the direction of the statute. It then proceeded, however, by an order to grant to the short line railroads two days free time for interchanged loaded cars, and denied compensation altogether in the case of cars received for return loading with coal from coal mines customarily dependent upon connecting carriers for car supply.

That exceptions of this character could be made if applied to all railroads, may be conceded, but that is not what was done. Here the Commission, having found that *all* railroads were entitled to receive a definitely fixed sum per day for every car used by a foreign line, entered an order relieving some of the railroads, in whole or in part, from such payments. Plainly this order is in flat opposition to the finding and cannot be permitted to stand.

Confiscation may result from a taking of the use of property without compensation quite as well as from the taking of the title. *Chicago, M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418, 458; *Reagan* v. *Farmers' Loan*

& Trust Co., 154 U. S. 362, 410, 412; Chicago, M. & St. P. R. Co. v. Wisconsin, 238 U. S. 491, 498–499. The use of railroad property. is subject to public regulation, but a regulation which is so arbitrary and unreasonable as to become an infringement upon the right of ownership constitutes a violation of the due process of law clause of the Fifth Amendment. Atlantic Coast Line v. No. Carolina. Corporation Comm., 206 U. S. 1, 20. And certainly a regulation permitting the free use of property in the face of an express finding that the owner is entitled to compensation for such use cannot be regarded otherwise than as arbitrary and unreasonable.

If, as claimed, the earnings of the short lines are insufficient to enable them to make full payment of car hire costs, the Commission may be able to afford a remedy by increasing the rates, or by a readjustment of the division of joint rates. New England Divisions Case, 261 U. S. 184; Beaumont, S. L. & W. Ry v. United States, 282 U. S. 74. It cannot be done by confiscating for their benefit the use of cars of other railroads. Short lines, as well as trunk lines, participating in joint rates, must furnish their share of the equipment. If they do not own cars, they must rent them. The Commission itself has pointed out very clearly the basis for this requirement. Virginia Blue Ridge Ry. v. Southern Ry Co., 96 I. C. C. 591, 593:

" The per diem that complainant pays for car hire is merely equivalent to interest, depreciation, insurance, taxes, and other car-ownership costs which it would have to bear if it owned the cars used in interline traffic. The car owner incurs these costs in the first instance, and is reimbursed by complainant [a short line] through the per diem or rental charges, thereby relieving the latter of the necessity of investing in equipment for this service."

The case does not present a question of apportionment of car hire costs. The Commission undertook to deter-

mine, and did determine, what was a reasonable compensation for the use of cars, and definitely fixed that compensation on a per diem basis. It then, by its order, denied such reasonable compensation in certain cases. This is in no proper sense an apportionment of expense, but a plain giving of the free use of property for which, the Commission had concluded, the owner should be paid. We must deal with cases as they are made, not as they might have been made. To do otherwise, if we had the power, would be only to invite confusion. What the Commission would do in a proper case of apportionment, involving many elements for consideration not now before us, we are not advised; and it has made no findings suitable to a determination of that matter.

We find no reason for applying a different rule in respect of the clause of paragraph (5) which altogether relieves the short lines from the payment of car hire on coal cars received for return loading with coal from mines customarily dependent upon connecting carriers for car supply. This is a blanket order in opposition to the express finding of the Commission quite as much as that part of the paragraph which grants to the short lines two days free use of cars. The general rule in respect of the obligation of a railroad, whether a short line or a trunk line, to furnish equipment for the transportation of freight tendered to it, applies to the case of coal loaded at coal mines as well as to other traffic. Demurrage on Coal and Coke, 102 I C. C. 554, 557, 558, citing Brick from Michigan City, Ind., 42 I. C. C. 509, 511, where the general rule is stated.

In the first named case the Tennessee Railroad, a short line, undertook, by a proposed tariff, to make a demurrage charge against cars held at coal mines, as an offset to per diem charges paid by it to the Southern Railway. The Commission, however, regarding the tariff as an attempt

to transfer the railroad's car-hire expense to the coal operators, required the tariff to be canceled, saying:

"Although respondent states that the proposed schedule was published for the sole purpose of recovering its car-hire cost on cars under load, it would be applicable to all cars. In other words, it would have the effect of largely offsetting respondent's cost of car hire by assessing shippers an amount equal thereto beyond a certain time. Respondent is under obligation to furnish the equipment necessary for the transportation of traffic tendered to it, and if it does not possess such equipment the charges paid for the revenue [evidently meaning rental] thereof can not be considered as an item of expense which is not included in the rate."

There is nothing in § 1 (12) of the Interstate Commerce Act, as amended, which affords a basis for this part of paragraph (5), although the terms of the order might suggest that this subdivision was relied upon. Section 1 (12) has relation only to the subject of car distribution, that is, to a " just and reasonable distribution of cars " by each railroad " for transportation of coal among the coal mines served by it, whether located upon its line or lines or customarily dependent upon it for car supply." See *Assigned Car Cases*, 274 U. S. 564, 577. The object of this provision was to insure a proportional distribution of all available coal cars so as to afford a fair and equal opportunity to each mine to enjoy their use on the basis of its rating. *Baltimore & O. R. Co.* v. *Lambert Run Coal Co.*, 267 Fed. 776, 779.* It has nothing to do with the question of compensation for the use of cars by non-owning railroads. That subject, as already appears, is covered by § 1 (14).

---

* This case came to this court by appeal from the Circuit Court of Appeals and was remanded with a direction to dismiss for want of jurisdiction and without prejudice. *Lambert Co.* v. *Baltimore & O. R. Co.*, 258 U. S. 377.

The part of the order [paragraph (5)] now under consideration creates an exemption in favor of all short lines and against all connecting carriers, irrespective of varying circumstances, in the face of a general finding that *all* common carrier railroads are entitled to compensation in the form of daily rental for the use of cars *when on foreign lines.* The language of the finding could not be more comprehensive. If followed, it necessarily compels payment of rental by the lines exempted as well as all other lines. It affords no justification for any exemption. We are not called upon to consider the evidence, since the Commission, upon the evidence, has made its findings. The vice of the situation is that the order of the Commission, that is to say, its judgment, does not conform to its conclusions upon the facts. In disapproving this paragraph, we do not mean, for the present, to go beyond the precise case presented, or to pass upon the question of the authority of the Commission to make fair apportionment of car-hire costs, or, in special cases, to make adjustments and afford a proper measure of relief in the matter of payment of charges for the use of cars. Compare Ohio Farm Bureau Federation *v.* Ahnapee & W. Ry. Co., 89 I. C. C. 489, 499; Kanawha Black Band Coal Co. *v.* Chesapeake & O. Ry. Co., 142 I. C. C. 433, 442.

It follows that the court below should have set aside paragraph (5) of the order.

*Decree reversed.*

MR. JUSTICE STONE, dissenting.

Acting under authority conferred by the Esch Car Service Act [§ 1 (14) of the Interstate Commerce Act, as amended by Transportation Act, 1920, February 28, 1920, c. 91, § 402, 41 Stat. 456, 476], the Interstate Commerce Commission, after a nation-wide investigation, has prescribed certain rules which affect compensation for the

use and detention of freight cars on lines of common carriers other than their owners. The principal subject of controversy here is the validity of so much of the Commission's order as relates to the apportionment of car-hire charges upon cars interchanged between a designated class of short line carriers and their trunk line connections. This part of the order, as well as that which the Court has sustained, should, I think, be held valid.

At the outset it should be pointed out that the part of the order held void does not deny to car owners the right to compensation for the first two days that a car is on the rails of a short line of the designated class. Regardless of the ownership of the car the order determines only which of the connecting carriers shall bear the burden of that compensation. The connecting trunk line may or may not own the car, but in either case the purpose and effect of the order is to determine the fair share of the *per diem* car-hire expense to be borne, respectively, by a trunk line and its connecting short line of the particular class, participating in a through route.

An adequate appreciation of the nature of the problem with which the Commission was required to deal by § 1 (14) involves an examination of the history and present day practices of car interchange between connecting carriers in the United States. In their early history the railroads in this country did not permit freight cars which they owned to leave their rails, and freight to be transported over more than one line was unloaded and reloaded at junction points.[1] With the development of more efficient transportation methods after the Civil War, this uneconomical and time-wasting practice was gradually abandoned. In 1886, the adoption by the southern rail-

[1] For discussions of early practices of car supply, see Matter of Car Shortage and Other Insufficient Transportation Facilities, 12 I. C. C. 561, 573; Matter of Private Cars, 50 I. C. C. 652, 656, 657; Henry S. Haines, Efficient Railroad Operation (1919) 335.

roads of standard gauge track removed the last physical barrier to free interchange of equipment throughout the nation; and in 1911 a rule which the railroads had long before come to recognize as a necessity of commerce was declared to be an obligation of law, when the Interstate Commerce Commission, under the amended Interstate Commerce Act, decided that carriers could not refuse to permit their freight cars to pass onto rails of connecting carriers. Missouri & Illinois Coal Co. v. Illinois Central R. Co., 22 I. C. C. 39; see St. Louis Southwestern Ry Co. v. Arkansas, 217 U. S. 136, 145, 146, 148. The obligation has never since been doubted, and the power to regulate it is exclusively vested in the Commission. Assigned Car Cases, 274 U. S. 564; United States v. New River Co., 265 U. S. 533.

This freedom of car movement has been attained without impairment of the basic obligation of rail carriers to furnish equipment for carriage, either by owning it or hiring it, and, if by hiring it, to pay proper compensation.[2] Until comparatively recent years, the standard of compensation has been fixed by the railroads themselves, by custom or agreement. Before 1902 the prevailing and customary basis was mileage; but this proved unsatisfactory. The then existing mileage rates are said to have been inadequately compensatory; the car owner had no means of verifying mileage on foreign lines; and no incentive was furnished for the prompt handling of cars. The first

---

[2] On the obligation of a common carrier (as respects other railroads) to furnish its own equipment or pay reasonable compensation for foreign cars, see Louisville & Nashville R. Co. v. Central Stock Yards Co., 212 U. S. 132, and also Virginia Blue Ridge Ry. v. Southern Ry. Co., 96 I. C. C. 591, 593; Western Pine Lumber Co. v. Director General, 96 I. C. C. 625, 628; Morehead & North Fork R. Co. v. Chesapeake & Ohio Ry. Co., 100 I. C. C. 45, 48; Jefferson & Northwestern Ry. Co. v. Missouri, K. & T. Ry. Co., 102 I. C. C. 72, 75.

difficulty might, with some exceptions, have been removed by increasing the rates, but the second and third were inherent in the system, and the last involved, not the adequacy of the compensation for the use of cars, but the failure of the rate to exercise any controlling influence on car movements.

To meet these objections, the American Railway Association, in 1902, after many years of discussion and investigation, formulated a radically different method of car-hire settlement, a method which, as steadily elaborated and modified in the light of experience, has remained in force ever since. The basis of this plan is the requirement that every carrier using a car belonging to another shall pay to the owner a flat sum (fixed at one dollar since 1920) *per diem*, the liability for the following twenty-four hours to attach to the carrier holding the car at midnight.[3] Other provisions pertinent to this controversy are the agreement exacted of each member road to report daily to car owners all cars currently interchanged,[4] and the exemption granted to switching railroads, under certain circumstances, from the otherwise unvarying liability of the carrier in possession of a foreign car to pay *per diem* charges on it.[5] Under this exemption, denominated " switching reclaim," a carrier using cars in so-called " terminal switching service," pays *per diem* costs in due course on each car, but is entitled to recover from the connecting line haul carrier an amount per car based on the average detention period of cars in such service.

The American Railway Association is, and has been since its inception, a purely voluntary organization. · No carrier is bound to subscribe to its Code of Per Diem

---

[3] Per Diem Rules, 1, 2, 9a.
[4] Per Diem Rules, 9a.
[5] Per Diem Rules, 5.

Rules; and no carrier operating less than one hundred miles of road is eligible to voting membership, although it may become an associate member, subject to the reciprocal rights and obligations of the Code, which the Association, by its voting members, prescribes. Subscription to the Per Diem Code entails substantial burdens, some of them peculiarly onerous for short lines.[6]

Of the 1731 steam railroads in the United States, 384 do not subscribe to the agreement; and of these nearly all are short-line, Class III roads, that is, roads having annual operating revenues of less than $100,000. Many of them are less than ten miles in length. Several important rules of the Association deal with relations between subscribers and this group of non-assenting lines. It is the frankly admitted aim of the Association to coerce the non-assenting lines into joining it, by subjecting them to treatment substantially less favorable than that accorded to subscribers. The cars of nonsubscribers are not paid for on a *per diem*, but on a mileage basis, concededly less remunerative. They are denied the privilege, granted to Association members, of the switching reclaim. In addition, since 1922, trunk line members have been expressly prohibited from making car-hire arrangements with their nonsubscribing connections on any other than a strict *per diem* basis—arrangements to which the short lines assert their special situation entitles them, and which many trunk line members of the Association have granted in spite of the Code; others have expressed their willingness to grant it, were it not for the prohibition of the Code. This coercive use of the regulations, together with the asserted unfair-

---

[6] Annual dues of associate members are $40. They are required to abide by all the rules of the Association, which include the maintenance of daily accounting reports with car owners throughout the country. They must become members of the Bureau for the Safe Transportation of Explosives, and parties to the Interchange Agreement, and must put in force the National Car Demurrage Rules.

ness of the *per diem* basis generally to short lines, forms the background of the Commission's order now under review.

By the Esch Car Service Act, the Interstate Commerce Commission was given sweeping control over rules of car interchange and car-hire settlement,[7] and the authority conferred by it in respect to compensation for use of cars has been exercised by the Commission in numerous instances upon complaint by individual carriers.[8] With such complaints pending before it, together with a petition by the American Short Line Railroad Association, the Commission, on January 4, 1926, instituted a general investigation upon its own motion, reopening many of the decided cases and consolidating pending ones with the general inquiry. An extended record was made up, embracing some 5000 pages of testimony and more than 500 exhibits. The order ultimately issued by the Commission, embodied in five numbered paragraphs, was addressed to all common carriers by railroad in the United States. Rules for Car-Hire Settlement, 160 I. C. C. 369, 165 I. C. C. 495.

In this order the Commission made no effort to replace in their entirety the *per diem* rules of the American Railway Association. Instead it removed the discrimination complained of by bringing all common carriers by railroad, subscribers or nonsubscribers, within those rules, as modified, to meet certain of the objections growing out of the special circumstances of the short lines. Para-

---

[7] Section 1 (14) of this Act provides: " The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices, with respect to car service by carriers by railroad subject to this Act, including the compensation to be paid for the use of any locomotive, car, or other vehicle not owned by the carrier using it, and the penalties or other sanctions for nonobservance of such rules, regulations or practices."

[8] Cases cited in notes 15 and 16, *infra*.

graph (1) of the order entitles nonsubscribers to *per diem* payment for the use of their cars upon the same terms as the Association prescribes for cars of its members. Paragraph (4) requires all carriers, whether members of the Association or not, whose lines are more than 100 miles long or who receive cars from one subscriber and deliver them to another, to make car-hire settlements direct with car owners in accordance with the *per diem* rules. These provisions are not attacked by any of the appellant railroads. Paragraph (2) entitles nonsubscribers to switching reclaim, on account of cars handled in terminal switching service, upon the same terms as hitherto received by subscribers. The practical effect of this paragraph is to compel allowance of the switching reclaim to nonsubscribing short lines, since the existing practice of allowing the reclaim to subscribers is generally approved and regarded as necessary, as the revenue from switching services is insufficient to meet the car-hire cost of the carriers performing them. Paragraph (3) attaches short line railroads which return cars to the road from which received, to their connecting carriers for purposes of car-hire accounting and settlement. Paragraph (5) requires the same class of short line roads to pay *per diem* to their connecting carriers, but with the deduction of two days' free time per loaded freight car, and with the proviso that in the case of short line roads, " no car-hire need be paid on cars received for return loading with coal from coal mines which are customarily dependent upon connecting carriers for car supply."

This Court now holds that paragraphs (2) and (3) are valid, but, without considering the evidence, that paragraph (5) is void, being on its face so arbitrary and unreasonable as to deprive the appellants of property without due process of law. In support of this conclusion, it is said that, the Commission having found generally " that the present *per diem* charge of $1 per car-day reasonably

compensates car owners for average car ownership and maintenance costs," its order granting to the short lines the two days' allowance is in such flat opposition to this finding that the order cannot be allowed to stand as an exception to the general rule.

But there is no such opposition. The Commission was concerned and dealt with far more important questions than the determination of the reasonable *per diem* rental of a freight car. Its declared purpose in instituting the proceeding was to investigate the rules of car-hire settlements and to make " such order . . . in the premises as might be warranted by the record." The reasonableness of the two days' free time allowance and that of the switching reclaim were the chief subjects of its inquiry. The one which the Court has disapproved is no more an exception to the general finding than the other which it approves. Both were expressly found reasonable by the Commission and both are consistent with its adoption of the *per diem* as a standard for measuring the rental value of cars for purposes of car-hire settlements. The real issue presented upon the evidence, the findings and the order of the Commission is not whether the *per diem* is a fair method of compensating the car owner—all agree that it is—but whether it is a fair method of apportioning the burden of car-hire necessarily incident to a through route; not whether compensation should be paid, but who shall pay it. Upon the record, the Commission's findings and order cannot justly be characterized as declaring in the same breath that the two days' free time allowance is both reasonable and unreasonable. See *United States* v. *Wells*, 283 U. S. 102, 111, 120.

The Commission's investigation embraced all the elements which affect the use of the *per diem* as an instrument of regulation of the movement of interchanged cars and as a means of apportioning car-hire costs between trunk line carriers and connecting short line carriers of

the designated class participating in the joint haul. The findings of the Commission are based on the investigation which it made and support its order. For the following reasons, the fifth paragraph of the order is not open to the objections urged against it.

*First.* The very language of the Esch Car Service Act, authorizing the Commission to establish "rules, regulations and practices with respect to car service . . . including the compensation to be paid," treats car-hire as one form of regulation of the service. It is but a recognition of the historic fact that the car-hire charge may serve to penalize the unnecessary detention of cars and thus to regulate car movement, one of the considerations which led to the substitution of the *per diem* charge for the mileage system of car-hire payments.[9] In this respect it is analogous to demurrage, in which the penalty element of the money payment imposed is emphasized over the element of compensation.[10] It is for this reason, among

---

[9] As bearing on the primary purpose and function of the *per diem* system see the statement in Matter of Private Cars, 50 I. C. C. 652, 661, that during the years immediately following 1902 the mileage rates were actually more remunerative than *per diem,* and the suggestion that this was a main cause of many railroads forming subsidiary corporations to own and-lease private cars on a mileage basis. See also the early statement that the compensatory aspect of the mileage system was a minor one, since it was to be expected that, with a proper balance of car ownership, debits and credits for car hire would equalize themselves. Burton Stock Car Co. v. Chicago, Burlington & Quincy R. Co., 1 I. C. C. 132, 140. In later cases the Commission has adverted to the punitive aspect of *per diem,* New England Divisions, 62 I. C. C. 513, 537, 538, and has stressed also the element of reciprocity as distinguishing the situation of the line-haul carriers and that of many of the short lines: Virginia Blue Ridge Ry. v. Southern Ry. Co., 96 I. C. C. 591, 593; Lake Erie & Fort Wayne R. Co., 78 I. C. C. 475, 489; Marcellus & Otisco Co. v. New York Central R. Co., 104 I. C. C. 389, 392.

[10] For discussions of the nature and purpose of demurrage, important for its analogy to *per diem,* see *Turner, Dennis & Lowry Lumber Co.* v. *Chicago, Milwaukee & St. Paul Ry. Co.,* 271 U. S. 259, aff'g.

others, that the Commission has generally refused to consider car-hire costs in fixing divisions,[11] and in this case the Commission found that divisions had not customarily been adjusted with relation to, such costs.

That the *per diem* charge in its aspect as a penalty was an important element in the determination of the Commission, appears from its opinion and order. As the two days' free time allowance applies only to those cars which the short line receives from and returns to the line carrier, it is in practical effect limited to those cars with respect to which the short line renders terminal and originating services. Under the national demurrage rules, the terminal lines are compelled to allow to shippers two days' free time for loading and unloading before demurrage attaches. There is nothing in the Fifth Amendment to preclude the Commission, in apportioning car-hire costs, from giving consideration to the operation of the *per diem* charge as a penalty for the detention of cars and from making some allowance for the fact that the terminal carrier is in turn required to allow to shippers time free of demurrage charges. The two days which it did allow are by no means an exact offset of the free time allowed

2 F. (2d) 291; *Swift & Co.* v. *Hocking Valley Ry. Co.*, 243 U. S. 281; *Pennsylvania R. Co.* v. *Kittanning Iron & Steel Mfg. Co.*, 253 U. S. 319, 323. See also Investigation and Suspension of Advances in Demurrage Charges, 25 I. C. C. 314, 315.

[11] The Commission in its most extended discussion of the point said that car-hire costs never had been, and should not be, an element in the fixing of divisions. New England Divisions, 62 I. C. C. 513, 538. Other cases in which the Commission has discussed the relation of *per diem* to fair divisions are Chaffee R. Co. v. Western Md. Ry. Co., 156 I. C. C. 471; Western Md. Ry. Co. v. Maryland & Pa. R. Co., 167 I. C. C. 57, 63. In some exceptional circumstances, the Commission has weighed car-rental expenses when determining divisions of the freight rate. See Chaffee R. Co. v. Western Md. Ry. Co., 102 I. C. C. 53, 59; Middle Creek R. Co. v. Baltimore & Ohio R. Co., 168 I. C. C. 110, 117 (the fact that no car-hire was charged a short line was considered in fixing divisions).

under the demurrage rules.[12]  The amount of time to be
allowed was a matter for the judgment of the Commission,
influenced by this, together with all other relevant con-
siderations.  The Commission gave some, but not con-
trolling, weight to the fact that the short lines, when thus
serving as terminals, would be unduly penalized if no al-
lowance were made to offset the time allowed to shippers.
There was ample evidence supporting its conclusion, and
its order no more deprives the carrier of its property than
would a corresponding determination that time free of
demurrage should be allowed to the shipper, and that it
should be two rather than one or three days.

*Second.* In any aspect, the Commission's order cannot
be viewed as requiring trunk lines to furnish their short
line connections with free cars.  As stated, the part of the
order with which we are now concerned deals with the
problem of just apportionment, between certain connect-
ing carriers, of the car-hire cost of a joint haul.  The Per
Diem Rules of the American Railway Association make
that apportionment according to the length of time the
car is upon the rails of the respective carriers.  The Com-
mission found, and the evidence supports its finding, that
such an apportionment is in many respects unfair to short
lines, engaged in time-consuming terminal and originating
services.  The Commission's modification of the Railway
Association's formula is based upon the necessary deten-
tion of cars in the performance of such services by the
short line for the benefit of both carriers.  The assumption
is inadmissible that in so far as trunk lines are thus re-

---

[12] The terminal carrier may be required to allow four days' demur-
rage for a single car while on its line, two days for unloading and two
for loading.  The demurrage rules do not count Sundays or holidays,
nor, for certain commodities, days of stormy weather.  On the other
hand, the short line terminal carrier may benefit if the shipper does
not use his two days, although under the average demurrage agree-
ment the unused portion is likely to be inconsiderable.

quired to pay *per diem* while a car is on a connecting carrier's rails, they are necessarily compelled to assume an operating cost of the connection. It presupposes the answer to the very question to be decided—whether the *per diem* without allowances is a just basis for apportioning car-hire costs in the case of the short lines. The fallacy of the similar assumption, once commonly made, that mileage should be the sole test of the reasonableness of divisions of joint rates, was repeatedly pointed out both by the Commission and by this Court, before Congress specifically enumerated other elements for consideration.[13] In both cases, the reduction of the broad statutory injunction of reasonableness to a single one of its constituent elements, disregarding all others, produces a result with a false appearance of reasonableness, which, when gauged by the standard which the regulatory statute sets up, is unreasonable and unjust.

Far from representing any universal standard of natural justice for the fair apportionment of car-hire costs, the *per diem* system is of recent origin, and adopted with purposes primarily in view quite foreign to the simple end of accurate compensation.[14] The completely disparate measure of mileage prevailed until 1902. Mileage is still the basis upon which owners of private railroad cars are compensated,[15] and until the orders issued by the

[13] See, e. g., *O'Keefe* v. *United States*, 240 U. S. 294, 303, 304; Star Grain & Lumber Co. *v.* Atchison, T. & S. F. Ry. Co., 14 I. C. C. 364, 370; Stacy & Sons *v.* Oregon Short Line R. Co., 20 I. C. C. 136, 138; Divisions of Joint Rates and Fares of Missouri & North Arkansas R. Co., 68 I. C. C. 47, 59. Compare Transportation Act, 1920, February 28, 1920, c. 91, § 418, 41 Stat. 456, 486; *New England Divisions Case*, 261 U. S. 184, 195; New England Divisions, 126 I. C. C. 579, 667.

[14] See note 9, *supra;* Haines, *loc. cit. supra,* note 1; L. F. Loree, Railroad Freight Transportation (2d ed. 1929), pp. 383, 390.

[15] Under § 1 (14), the Commission has several times prescribed reasonable rates of compensation on a mileage basis for private cars. In Matter of Private Cars, 50 I. C. C. 652, 684–686, it considered

Commission in the present controversy, it was the measure of payment stipulated by members of the American Railway Association for cars of non-members. The *per diem* is admittedly but a rule of thumb, though the best which experience has devised to meet all the complex requirements growing out of the average car-hire situation. In a large number of instances the Interstate Commerce Commission, to secure a more just apportionment, has ordered that car-hire costs of certain short-line industrial common carriers be computed with a varying number of days of " free time "; [16] and in a still larger num-

---

the *per diem* basis at length and concluded that for private cars the mileage system was preferable. See also Armour & Co. *v.* El Paso & Southwestern Co., 52 I. C. C. 240; Paragon Refining Co. *v.* Alton & Southern R. Co., 118 I. C. C. 166; Assigned Cars for Bituminous Coal Mines, 80 I. C. C. 520, 556; *Assigned Car Cases,* 274 U. S. 564, 575.

[16] The Commission has many times, apparently acting under § 1 (14), prescribed terms of car compensation for industrial common carriers. Compare the approval, prior to 1917, of the placing of short lines on a demurrage basis, in Drummond & S. W. Ry. Co. *v.* Chicago, etc. Ry. Co., 21 I. C. C. 567. These cases took their starting point, before the passage of the Esch Car Service Act, in the Industrial Railways Case, 29 I. C. C. 212, 231–233, in which the Commission found that the switching reclaims under the *per diem* system were a fertile source of rebates and exemptions from demurrage for shippers who maintained independently incorporated railroads which were in substance plant facilities. Following the announcement in the *Tap Line Cases,* 234 U. S. 1, of a rule giving many of the roads involved in the Industrial Railways Case the status of common carriers, the Commission in a supplemental report, modified its original findings as to such carriers, and permitted them to reëstablish *per diem* and reclaims. 32 I. C. C. 129, 133. See also Second Industrial Railways Case, 34 I. C. C. 596, 600. Subsequently, however, in a long series of cases the *per diem* system as applied to industrially owned common carriers was condemned, and different methods of car hire compensation prescribed. In the Northampton & Bath R. Co. Case, 41 I. C. C. 68, 74, the effect of the arrangement prescribed was to give the carrier two days' free time counterbalancing the two days accorded shippers under the demurrage rules, plus one day in addition. In the Owasco River Ry. Case, 53 I. C. C. 104, 113, a straight *per diem* system was ordered;

ber of instances trunk lines themselves have voluntarily

but this basis of settlement was disapproved soon after in Birmingham Southern R. Co. *v.* Director General, 61 I. C. C. 551. In this case an industrial common carrier specifically besought the Commission to fix reasonable charges under § 1 (14), asking for a *per diem* system with reclaims for all cars, whether handled under switching rates or under joint rates with divisions. The Commission denied this relief, and condemned reclaims, but prescribed a demurrage system, giving the short line 72 hours free time on cars loaded one way, credits for cars sooner returned to be averaged against debits, and the short line to be free to execute average demurrage agreements with shippers. The Birmingham Southern was not eligible for switching reclaims under the A. R. A. rules in respect to traffic handled under joint rates. Its average detention of foreign cars was shown to be 3.2 days.

The so-called Birmingham Southern Rules were subsequently prescribed for other industrial common carriers in National Tube Co. *v.* Pittsburgh, C., C. & St. L. R. Co., 61 I. C. C. 590; Illinois Northern Ry., 61 I. C. C. 629; Pullman Railroad Co., 61 I. C. C. 637; Benwood & Wheeling Connecting Ry. Co. *v.* Pittsburgh, C., C. & St. L. R. Co., 62 I. C. C. 357; Tionesta Valley Ry. Co., 62 I. C. C. 473; Genesee & Wyoming R. Co., 62 I. C. C. 680; Lake Erie & Fort Wayne R. Co., 63 I. C. C. 122 (determining questions left open in 58 I. C. C. 558, 561, 666, 671, 677, 680); Moshassuck Valley R. Co. *v.* N. Y., N. H. & H. R. R. Co., 69 I. C. C. 368. See also Mount Hope Mineral R. Co. *v.* Central R. Co. of N. J., 74 I. C. C. 195, 199, 200. The question was reëxamined with respect to several of the roads involved in the preceding cases in Lake Erie & Fort Wayne R. Co., 78 I. C. C. 475, and the Birmingham Southern rules somewhat modified. In this case the notion that the object was to relieve the industrial common carrier altogether of car hire was specifically repudiated. *Ibid.* at 489. The Birmingham Southern Rules were again prescribed in Valley & Siletz R. Co. *v.* Southern Pac. Co., 80 I. C. C. 724; Hanging Rock Iron Co. *v.* Norfolk & Western Ry. Co., 87 I. C. C. 373; Lime Rock R. Co. *v.* Maine Central R. Co., 102 I. C. C. 48.

For other examples of the Commission's approval of the relief of short lines from strict *per diem,* see Mount Hood R. Co. *v.* Director General, 60 I. C. C. 116, 117; New York Dock Ry. *v.* Baltimore & Ohio R. Co., 89 I. C. C. 695, 696, 702, 706. Compare Jones & Laughlin Steel Co. *v.* Director General, 60 I. C. C. 325, 331.

With Virginia Blue Ridge Ry. *v.* Southern Ry. Co., 96 I. C. C. 591; there began a series of cases denying non-industrially owned

instituted such arrangements.[17]  The device of "switch-ing reclaim" itself, elsewhere concerned in this case, pointedly exemplifies the admitted inapplicability of the *per diem* system to certain special operating conditions. In this instance carriers engaged in a time-consuming switching service are in effect relieved altogether of car-hire costs; and the Court has sustained this departure by the Commission from the single standard of time of detention.  Perhaps the most striking example of all is the operation of the rule imposing upon the carrier in possession of a car at midnight liability for *per diem* for the following twenty-four hours.  Under this rule an intermediate carrier, incurring no delays for loading or unloading, may receive a car shortly after midnight, haul

---

short lines relief from the straight *per diem* rules of the A. R. A. The series was continued in Western Pine Lumber Co. *v.* Director General, 96 I. C. C. 625; Morehead & North Fork R. Co. *v.* Chesapeake & Ohio Ry. Co., 100 I. C. C. 45; Chaffee R. Co. *v.* Western Md. Ry. Co., 102 I. C. C. 53; and Jefferson & Northwestern Ry. Co. *v.* Missouri, K. & T. Ry. Co., 102 I. C C. 72; and concluded in Marcellus & Otisco Co. *v.* New York Central R. Co., 104 I. C. C. 389.  See also Superior & S. E. Ry. Co. *v.* Director General, 63 I. C. C. 431; Carnegie Steel Co. *v.* Director General, 80 I. C. C. 269, 270, 274.

This last group of cases states that the application of the Birmingham Southern Rules is to be restricted to industrial common carriers, and that their purpose is to prevent undue favoritism to the proprietary industries through the payment of switching reclaims.  Many of the roads in question, however, were operating at least in part under joint rates and divisions, and thus were not eligible for reclaims; and the allowance to them of a modified demurrage basis was much more favorable than *per diem*.  In the present investigation the Commission abandoned its distinction between industrial and non-industrial common carriers, revoked its determination in cases of both the Birmingham Southern and the Virginia Blue Ridge types, and substituted the provisions of paragraph (5) of its order.

[17] The following table, taken from the Commission's Report (Record, p. 39), illustrates the extent to which non-subscribing railroads out-

it several hundred miles, and by delivering it to a third road before the following midnight escape car-hire altogether. The seeming unfairness, when measured in terms of the period of detention alone, disappears when that element is examined in comparison with the compensating effects of the reciprocal operation of the rule between connecting carriers and the difficulties and expense of accounting for less than twenty-four hour periods. Freedom from the *per diem*, when all relevant considerations are taken into account, is therefore not necessarily a gratuity.

side of Chicago, have settled on some basis other than *per diem* with the trunk lines with which they exchange traffic:

| Trunk line | Nonsubscriber connections | | |
| --- | --- | --- | --- |
| | Total | Which pay straight per diem | Which settle on some other basis |
| Burlington | 18 | 2 | 16 |
| Chesapeake & Ohio | 10 | 5 | 5 |
| Great Northern | 21 | 0 | 21 |
| L. & N | 10 | 2 | 8 |
| Missouri Pacific | 20 | 3 | 17 |
| New Haven | 8 | 5 | 3 |
| Northwestern | 9 | 6 | 3 |
| Pennsylvania | 55 | 6 | 49 |
| Soo Line | 12 | 4 | 8 |
| Southern | 27 | 20 | 7 |
| Southern Pacific (Pacific Lines) | 46 | 24 | 22 |
| Southern Pacific (Texas and Louisiana) | 14 | 10 | 4 |
| St. L. S. W | 7 | 3 | 4 |
| Union Pacific | 15 | 6 | 9 |
| B. & O.[a] | | | |

[a] Exact number not given.

This table includes 67 industrial roads among the nonsubscriber roads and is therefore not a wholly accurate reflection of the relations of other short lines with the trunk line carriers; but even when the industrial roads are eliminated from the table, it is still apparent that the trunk lines disregard the Code with respect to a large proportion of the total nonsubscriber connections. Settlement with industrial roads on other than the *per diem* basis does not violate the Code. But the present order of the Commission, it may be noted, does not distinguish between industrial and other short lines.

In attempting to find a measure of the just apportionment of car-hire costs, the railroads and the Commission have had to face a condition of extraordinary complexity, and not a theory. The Fifth Amendment does not command the impossible. It does not demand that the power and duty of the Commission to make the apportionment be thwarted by requiring it to adopt a standard of unattainable exactness. The validity of what is of necessity a rule of thumb, best adapted to secure a just apportionment, can hardly depend upon a perfect precision in its application; its imperfections in this respect are themselves compensated by an advisedly sought simplicity and convenience of operation.

Under these circumstances, it is not to be supposed that in a special situation such as that of the short lines, the mere departure by the Commission from the *per diem* basis for apportioning car-hire costs between parties to a joint haul, can of itself constitute either a taking of the property of the carrier affected by it, or a taking of it without compensation. The appellants have no vested right not to pay their share of the hire of cars engaged in a joint service to which they are parties, simply because those cars are temporarily off their own rails. They are entitled only to have the Commission make reasonable rules for car-hire apportionment; and the reasonableness of any rule which it may adopt is a question wholly independent of its conformity to the measure of time of detention or to the Per Diem Rules of the American Railway Association. The reasons which support that part of the order allowing switching reclaims, as well as those advanced by the Court to justify that imposing on the trunk lines the burden of accounting for car-hire settlements on cars exchanged with the short lines, do not differ in principle from those which support the two day allowance, and at least should have led to some consideration by the Court of the evidence warranting the latter.

*Third.* The appellants have not sustained their burden of establishing that the Commission's rule is unreasonable. The principles to which courts ordinarily adhere in reviewing orders of the Commission do not admit of dispute. If the Commission does not refuse to consider relevant evidence, if it does not proceed upon a mistake of law, if it acts upon evidence sufficient to support its findings, the Court will not itself undertake to weigh such evidence, to inquire into the soundness of the reasoning which induced the Commission's conclusions, or to question the wisdom of regulations which it prescribes. *New England Divisions Case,* 261 U. S. 184, 203, 204.

But the position of appellants is that the question is not one of the reasonableness of the Commission's action. They insist that as the *per diem* is an operating expense, like any other which the short line must pay, no evidence can justify an order that it should be paid by any other railroad.[18] Their position ignores the fact that the action of the Commission is no more than the exercise of its undoubted power to apportion the car-hire costs of a joint service by connecting lines, and is based upon a fundamentally erroneous theory of the powers of the Commission to prescribe reasonable rules for car-hire settlement. The *per diem* principle adopted by the American Railway Association in 1902 is not embedded in the Fifth Amendment adopted by this nation in 1791. Departures from it are not forbidden any more than any other action which may be taken under Section 1 (14), if reasonable and supported by adequate evidence. See *Assigned Car Cases, supra,* p. 580.

Nevertheless, appellants have presented no argument either here or below upon the reasonableness of the present departure or upon the issue of the adequacy of the evidence. During the Commission's hearings they

---

[18] Appellant's brief, p. 95.

steadily opposed the introduction of testimony relating to comparative proportions of car-hire expense and operating costs as between short lines and trunk lines, or to the comparative proportions of car-hire expenses and operating revenues. They offered no such evidence themselves; nor did they attempt to defend the fairness to the short line carriers of the *per diem* basis of apportioning car-hire costs, beyond asserting that a fair apportionment of such costs was necessarily an apportionment *per diem,* an assertion unsupported by any evidence to establish the unfairness of any other of the formulae proposed. The appellants having confined their entire case to this contention, it suffices for this Court to point out their error.

*Fourth.* Even assuming the question of the sufficiency of the evidence to be open, it is clear that the Commission had ample evidence before it to show that short lines were being compelled to bear a disproportionate burden of car-hire costs. It was undisputed that the *per diem* system was adopted by the larger carriers in disregard of protests of the short lines, and that the *per diem* rules had been modified and elaborated by members of the American Railway Association without giving the short lines a voice in the decisions. The evidence left no possible question that the short lines lost heavily by the replacement of the mileage system, which imposed no car hire whatever for equipment not in motion, by the *per diem* system, which emphasizes the period of detention. Short line witnesses presented a mass of evidence of the time-consuming character of the services performed by short lines in terminal and originating operations, including spotting and weighing cars, issuing through bills of lading, maintaining joint tariffs and computing rates, and most important of all, the allowance to shippers of two

days' free time for loading and unloading, as provided under the National Demurrage Rules.[19]

It was urged that with the two days' allowance to short line feeders, the trunk lines could still derive more net revenue from the haul than would accrue if the shipments originated on their own lines at the points of interchange. There was evidence that operating conditions of short lines, because of the very shortness of the haul and physiographical and other difficulties, are characteristically unfavorable to speed in handling. Many witnesses testified that the measurement of car-hire costs by time of detention imposes a peculiarly heavy burden upon a class of carriers benefited by paragraph (5) of the Commission's order, that is, short lines engaged in returning loaded cars empty, or empty cars loaded, to trunk line connections, because, unlike other lines engaged only in part in such operations, they never have the opportunity of averaging gains and losses, the advantage of a long haul with the disadvantage of a short.[20]

In corroboration of this testimony a great amount of evidence was received, as a result of a questionnaire sent to all short lines desiring to be heard, to show that the ratio of car-hire expenses to total expenses, and of car-hire costs to revenues was substantially higher for the short lines than for their trunk line connections. Upon

---

[19] Note 10, *supra*. See Loree, *op. cit. supra,* note 14, p. 322 *et seq.;* also pp. 264, 268 *et seq.*, showing a great preponderance of car time occupied by loading and unloading and terminal and delivery movement. " There is general agreement between (*sic*) the railroad men that the time consumed by an average car on the road is very insignificant in comparison with that in the terminal and intermediate yard and for loading and unloading." Shih-Hsuan King, Railroad Freight Car Service—Control by the Car Service Division of the American Railway Association, p. 67.

[20] See note 14, *supra*.

such a record it cannot be said that the Commission could give no weight to those considerations and could not reasonably conclude that the short lines were entitled to relief; on the contrary, the evidence justified the conclusion that the *per diem* basis enforced or threatened to be enforced against them by the American Railway Association would, in fact, result in transferring to larger roads part of the legitimate revenues of the short lines, and thus would deprive them of their property without any process of law whatever.

*Fifth.* The Commission's order does not go beyond the relief to which the short lines showed themselves entitled, nor does it prescribe a formula unreasonably burdensome upon their trunk line connections, nor is it based upon an improper classification. Paragraph (5) is strictly limited to cars which are used by short lines in terminal or originating services; and to that extent is accurately framed to meet the only substantial complaint which the short lines made. It is also apparently limited to *carriers* engaged *exclusively* in such service; and appellants suggest that the resulting exclusion of roads performing any amount of intermediate service, however slight, is arbitrary and unreasonable. Whatever the proper construction of the order, and whatever the justice of any complaint by a carrier of the class excluded, it is sufficient answer here that appellants do not themselves belong to that class, *Roberts & Schaefer Co.* v. *Emmerson,* 271 U. S. 50, 54, 55, and cannot complain that the Commission's order was not given a wider application.

The order also excludes terminal or originating carriers of more than one hundred miles in length, a class to which appellants do belong. The opinion of the Court concedes that the two-day allowance would be valid if made to all railroads, but insists that an allowance which could be made to all cannot be made to a selected class, the short lines which perform terminal services. The contention is

in effect that the Commission, confronted with evidence of the peculiarly onerous operation of *per diem* charges on terminal and originating movements, had power to relieve it, if at all, only by establishing a system of universal reclaim for terminal and originating car-hire costs, analogous to switching reclaim, and running in favor of all carriers engaged in such service. But the Commission's authority is not restricted either by § 1 (14) or by the Constitution to granting relief to all or none, regardless of their need. There was abundant evidence that the *per diem* system equalized itself for trunk line carriers through the averaging of gains and losses from long and short hauls. There was no evidence that the trunk lines regarded that system as unfair. The limitation of the order to carriers of less than 100 miles engaged exclusively in terminal or originating services, whose special situation rendered the *per diem* peculiarly burdensome to them, falls well within the bounds of reasonable classification marked out by the decisions of this Court. *Wilson* v. *New*, 243 U. S. 332, 354, and cases cited.

Nor was the Commission's action within the class chosen unreasonable. A remedy may, and, in the present case, must be shaped to meet the evil. Instead of abandoning the *per diem* system altogether for the benefit of the comparatively few roads prejudiced by it, the Commission lightened its burden upon them by a rule of thumb no more crude or arbitrary than the principle of *per diem* itself. Had it returned all roads to a mileage basis, or, as the opinion of the Court suggests, allowed the two days to all roads, the short lines would equally have been relieved of the disadvantages of *per diem*, but the trunk lines would have lost its advantages. The remedy given by the Commission retains the benefits of *per diem* and relieves the short lines of the brunt of the burden arising from the two free days accorded shippers, while leaving them to bear the other special costs created

by a time measure for short hauls, and conforms to the urgent suggestions of trunk line witnesses that any practicable rule must be simple of statement and ready of application. It is less extreme in result than the device of switching reclaim, in approval of which this Court and the Commission agree, and which was designed to relieve carriers whose services, many witnesses testified, are distinguishable from those of these short lines only by being performed under a switching rather than a line haul rate. Virtually all the 141 short line witnesses testified to the average detention period of cars on their lines, and many of them to the amount of car-hire which would be incurred under the Commission's proposed rule. The record justifies the opinion that only rarely would the short lines escape the payment of substantial sums, and then only under circumstances as exceptional as those created by the midnight rule already mentioned. The weighing of evidence of this sort is peculiarly a matter to be left to the administrative " tribunal appointed by law and informed by experience." *Illinois Central R. Co.* v. *Interstate Commerce Commission*, 206 U. S. 441, 454. No adequate reason has been advanced for rejecting the conclusion which that tribunal drew from the evidence presented to it.

*Sixth.* The Commission, under the authority conferred by paragraph (14) to establish reasonable rules and practices for car service, " including the compensation to be paid for the use of any . . . car," is empowered to make orders of the character issued in this investigation without instituting a divisions case to review the rate structure and financial condition of every carrier in the country. The contention of appellants to the contrary is based upon grounds so sweeping as either to deny the existence of the power or to render impossible its effective exercise. It is urged that the effect of the Commission's order is

to require a transfer of revenue from appellants and other roads similarly situated to the designated short-line carriers; that rates, divisions, and financial condition of the railroads were not in issue; and that the Commission cannot avoid the rules governing the fixing of divisions by effecting a redistribution of revenue between carriers under the guise of regulation of car-hire. But as any alteration in the rules governing compensation for the use of cars authorized by § 1 (14) necessarily affects the revenues of the carriers concerned, the argument amounts to an assertion that there can be none except in a divisions case.

In so far as the appellants' imputation is that the Commission was less concerned with fair apportionment of car-hire costs than with financial rehabilitation of weak lines, it may be said shortly that this is without support in the record. The Commission did consider, and properly so, the relation between car costs and total operating costs of short lines, and between car costs and revenues from joint hauls. It found that the short lines were paying disproportionately large sums for the use of cars; and it found further that their rates and divisions had not customarily been adjusted with relation to such costs.[21] The Commission's power to remedy an unfair basis of car-hire apportionment is not confined to remitting the injured carriers to the uncertainties of rate litigation which, but for that unfairness, would be unnecessary, and which opens up a multitude of unrelated questions serving only to obscure the immediate issue. Many of the short lines are not able financially to litigate a divisions case. Rates established to absorb unduly heavy car-hire costs, moreover, must themselves be unduly high; and in many instances would defeat the object of relief. Finally, the

---

[21] See note 11, *supra.*

Commission is without jurisdiction to adjust many divisions of intrastate rates. Its authority over car-hire charges is without such limitation.

The Commission considered at length its power and duty to apportion car-hire costs independently of divisions. Its judgment that they should be dealt with under the authority conferred by § 1 (14), was in accordance with the unvaried practice of the trunk lines, whose traffic and transportation departments have customarily kept divisions and car-hire rigidly divorced. There is no basis, either in fact or law, for the assumption that the questions involved in an apportionment of car-hire, at least in cases like the present, are not separable from those involved in a divisions case, or for the assertion that the power conferred on the Commission by § 1 (14) cannot be exercised independently of its power to order a division of a joint rate.

Considerations especially applicable to coal cars placed on mine sidings on the short lines for loading, but analogous to those which led to the two-day allowance for cars of other types, support the conclusion of the Commission that the *per diem* rule should not operate at all in the case of the former. It suffices to say that the difference is based upon the peculiar character of this traffic and of the originating service rendered, and particularly upon the fact that under the applicable demurrage rules short lines are forbidden to collect any demurrage on coal cars so placed. See Demurrage on Coal & Coke, 102 I. C. C. 554. The principle involved being the same as that underlying each of the other provisions of the order, this one, like the others, should not have been disturbed unless an examination of the evidence disclosed that it was not reasonable.

The judgment should be affirmed.

Mr. Justice Holmes and Mr. Justice Brandeis join in this opinion.