**FLORIDA ROCK INDUSTRIES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 266–82L.

United States Claims Court.

May 6, 1985.

John A. DeVault, III, Jacksonville, Fla., with whom were C. Warren Tripp, Jr. and Bedell, Dittmar, DeVault, Pillans & Gentry, Jacksonville, Fla., for plaintiff.

Fred R. Disheroon, Washington, D.C., with whom were George B. Henderson and Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

This case presents the question of whether denial of a dredge and fill permit by the U.S. Army Corps of Engineers pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1344 (1982), constitutes a taking of plaintiff's property, where the property can be put to no viable economic use without such a permit.

### Background

On September 21, 1972, plaintiff bought about two and a half square miles (1560 acres) of unimproved wetlands in Dade County, Florida, several miles inland from the city of Miami. Plaintiff's property is situated above a limestone formation that is approximately 50 feet deep. The limestone is suitable for mining and tests indicate that the property would yield some 100,000 tons of usable rock per acre.[1]

Plaintiff is in the business of manufacturing and selling crushed stone and aggregates for use in construction. It bought the property for the specific purpose of mining the limestone from which these materials are produced. Plaintiff considered

---

**1.** The court makes no finding as to the amount of limestone on the property or its value. These issues may be resolved through further proceedings in the damages portion of this case.

the property particularly well suited to its purposes because of the proximity to Miami and the fact that a spur of the Seaboard Coast Line Railroad servicing a nearby quarry could be extended to provide a convenient and economical means of transporting the limestone to other parts of the state.

Rock mining is common in the part of Dade County where plaintiff's property is located. The normal method of extracting limestone is by use of a dragline, a large mechanical device that looks somewhat like a crane. The dragline is placed near one corner of the property on a pad (an area covered with crushed rock or other filler to raise it above water level). The peat layer covering the limestone is then removed from the area adjacent to the pad, exposing the rock. The rock is loosened through blasting and then scooped out by the dragline. After some processing, the rock is placed on trucks or box cars for shipping. When the dragline finishes removing all of the rock within its reach, it is moved to a new location. Blasting and excavation begins anew until the cycle is completed and the dragline must be moved again.

Excavation continues in cycles in a single direction leaving behind a trench some 50 feet deep and filled with water. When the dragline reaches the end of the excavation area, it reverses course and digging continues immediately adjacent to the trench just completed. With each sweep of the dragline, the trench becomes wider; it eventually develops into a deep body of standing water. This body of water is incapable of sustaining the rich variety of plant and animal life found in the displaced wetlands.

When plaintiff bought the property, it had all of the necessary state and local permits or waivers to operate a limestone quarry; there were no applicable federal statutes or regulations. Approximately one month later, Congress passed the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.* (FWPCA). This legislation gave the Army Corps of Engineers jurisdiction to issue permits for discharging certain materials

into the "waters of the United States." In 1977 the Corps issued regulations taking the position that this phrase extends the Corps' jurisdiction to wetlands.

The removal of limestone does not, per se, implicate the FWPCA or require a permit from the Corps. Nor is the destruction of the wildlife habitat associated with limestone removal, in and of itself, a basis for exercise of Corps jurisdiction over plaintiff's activities. The Corps' sole basis for jurisdiction is the fact that, as part of the mining process, plaintiff must temporarily deposit the excavated material onto wetlands immediately adjacent to the excavation. This occurs in two ways. First, some of the excavated material is used to construct the pad or platform on which the dragline sits. Second, after material is removed from the excavation pit, it is normally deposited on the ground for drying and processing before it can be shipped.

Because of a serious downturn in the southern Florida building industry in the mid-1970s, plaintiff did not begin mining until July of 1978. At that time, plaintiff was unaware of the Corps' jurisdiction or the need to obtain a federal permit. The Corps discovered plaintiff's activities and issued a cease and desist order on September 7, 1978. Plaintiff complied and began preparing a permit application. As a condition for considering the application, the Corps required that plaintiff restore the property to its pre-excavation condition.

On October 1, 1979, plaintiff submitted to the Corps an application for a permit covering a 98 acre portion of the property. Plaintiff, in fact, intended to excavate all of its property. However, the Corps had advised prospective applicants that it would not consider applications that covered more than about three years of excavation. Plaintiff estimated that excavation of the property covered by its application would take about that long, while it might well take many decades to excavate the entire tract.

On October 2, 1980, the Corps denied plaintiff's permit application. Plaintiff did not seek judicial review of that decision.

Instead, it brought suit in our predecessor court claiming that denial of the permit constituted a taking of its property because there are no economically viable uses (other than rock mining) to which the land may be put.

### Key Findings of Fact

Trial on the question of liability was held in Florida from January 3 through January 11, 1984. After briefing and argument, the court made a number of oral findings of fact, the following of which are crucial to analysis of the issues presented:

(1) At the time the Corps issued its cease and desist order, plaintiff had all the necessary state permits or waivers, as well as the economic resources, to mine limestone on its property. Limestone mining would have afforded plaintiff substantial economic gain.

(2) Under the current state of technology, it is impossible to profitably mine limestone on plaintiff's property without a Corps of Engineers dredge and fill permit. *See also* p. 165 n. 4 *infra.*

(3) Rock mining is the only viable economic use to which the property can be put. Some other uses (such as hunting and fishing) would not yield sufficient income to cover even real estate taxes. Because of its location, the property is not suitable for residential construction or commercial activity. In any case, construction connected with such alternative uses would require the issuance of a Corps permit. Such uses would alter the character of the land and surrounding environment much more drastically than limestone mining; it is unthinkable that the Corps would issue such a permit in light of its denial of plaintiff's application. *See also* p. 178 n. 23 *infra.*[2]

### Discussion

Plaintiff claims a regulatory taking. Specifically, it argues that the United States has so seriously interfered with its right to use and enjoy its property as to render the property economically useless.

The concept of a regulatory taking is not new in the law. More than half a century ago, the Supreme Court held that a state statute that effectively deprived the plaintiff of the right to mine its land constituted a taking compensable under the fifth amendment. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 414–15, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922). Over the years, the Supreme Court, the Court of Claims and the Court of Appeals for the Federal Circuit have consistently upheld the principle that excessive regulation may constitute a taking. *Ruckelshaus v. Monsanto Co.,* — U.S. —, —, 104 S.Ct. 2862, 2874–75, 81 L.Ed.2d 815 (1984); *Kirby Forest Industries v. United States,* 467 U.S. 1, —, 104 S.Ct. 2187, 2196, 81 L.Ed.2d 1 (1984); *Hodel v. Virginia Surface Mining & Reclamation Association,* 452 U.S. 264, 295–96, 101 S.Ct. 2352, 2370–71, 69 L.Ed.2d 1 (1981); *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Kaiser Aetnd v. United States,* 444 U.S. 164, 174–75, 100 S.Ct. 383, 389–90, 62 L.Ed.2d 332 (1979); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 138 n. 36, 98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631 (1978); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); *Skaw v. United States,* 740 F.2d 932, 939 (Fed.Cir. 1984); *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887–88 (Fed.Cir.1983); *Benenson v. United States,* 548 F.2d 939, 949, 212 Ct.Cl. 375, 392 (1977); *Pete v. United States,* 531 F.2d 1018, 1034, 209 Ct.Cl. 270, 297 (1976); *see also Whitney Benefits, Inc. v. United States,* 752 F.2d 1554, 1557 (Fed.Cir.1985).[3]

---

**2.** Additional findings of fact are set forth on the record of the May 7, and June 12, 1984, hearings and, where appropriate, in the body of this opinion.

**3.** In *Chicago, Rock Island & Pacific Ry. v. United States,* 284 U.S. 80, 52 S.Ct. 87, 76 L.Ed. 177

(1931), the Court noted that "[c]onfiscation may result from a taking of the use of property without compensation quite as well as from the taking of the title." *Id.* at 96, 52 S.Ct. at 92, *quoted with approval in Kaiser Aetna,* 444 U.S. at 174 n. 8, 100 S.Ct. at 390 n. 8.

The Supreme Court has enunciated the following test as to whether a regulatory taking has occurred: "A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land....'" *Hodel*, 452 U.S. at 295–96, 101 S.Ct. at 2370–71 (quoting *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141).

■ The court has found that denial of the permit by the Corps of Engineers made it impossible to profitably mine rock on plaintiff's property. To paraphrase Mr. Justice Holmes, "[w]hat makes the right to mine [rock] valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain [rock] has very nearly the same effect for constitutional purposes as appropriating or destroying it." *Pennsylvania Coal*, 260 U.S. at 414, 43 S.Ct. at 160.[4] In addition, the court has found that there are no other economically viable uses to which the property can be put. Denial of the permit therefore has deprived plaintiff of all economically viable use of its land. Applying the standard enunciated by the Supreme Court in *Hodel* and other cases leads to the conclusion that there has been a regulatory taking and that plaintiff is entitled to compensation.

■ Defendant has launched a volley of arguments as to why plaintiff should nevertheless be denied any recovery. Many of these arguments are ingenious and forcefully presented. If sustained, however, they would tie a claim for regulatory taking into a Gordian knot no plaintiff could ever hope to unravel. In considering defendant's arguments, therefore, the court is mindful of the Supreme Court's admonition that takings cases must not be resolved by mechanical application of formulae but through reason in light of common sense and experience. *Kaiser Aetna v. United States*, 444 U.S. at 175, 100 S.Ct. at 390;[5] *see also Monsanto*, —— U.S. at ——, 104 S.Ct. at 2874; *Goldblatt*, 369 U.S. at 594, 82 S.Ct. at 990; *Penn Central Transportation Co.*, 438 U.S. at 124, 98 S.Ct. at 2659; *Whitney Benefits, Inc.*, 752 F.2d at 1558; *Althaus v. United States*, 7 Cl.Ct. 688, 694 (1985).

### 1. *Plaintiff's Residual Rights in the Property*

■ Defendant first argues that plaintiff has not been deprived of its property because it retains valuable incidents of ownership: the right to use the land in its current condition; to restrict or permit access to it by others; to sell, lease or give it away, in whole or in part. According to defendant, plaintiff has been deprived of merely one in the "bundle of sticks" comprising its rights in the property, and such a partial deprivation does not constitute a taking. Defendant relies on such cases as *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62

**4.** Restriction of the right to extract minerals in a particular manner may not work a taking if there are alternative methods to profitably mine the property. *See Whitney Benefits, Inc. v. United States*, 752 F.2d at 1562 (Markey, C.J., dissenting). Here, defendant has admitted that it is aware of no method for removing the limestone from plaintiff's property without obtaining a Corps permit to fill wetlands. Hearing Transcript of Aug. 25, 1983, at 15–16. Edward L. Baker, President of Florida Rock, testified that there is no economically viable method of mining limestone that can be accomplished without some filling of the property. Trial Transcript of Jan. 3, 1984, at 127. The court is persuaded by Mr. Baker's testimony and finds that there is no profitable method of extracting limestone from plaintiff's property that would not require a Corps permit.

**5.** The following passage from *Kaiser Aetna* exemplifies the Court's unwillingness to be lured toward an absurd result by an elegant argument:

There is no denying that the strict logic of the more recent cases limiting the Government's liability to pay damages for riparian access, if carried to its ultimate conclusion, might completely swallow up any private claim for "just compensation" under the Fifth Amendment.... But, as Mr. Justice Holmes observed in a very different context, the life of the law has not been logic, it has been experience.

444 U.S. at 177, 100 S.Ct. at 391.

L.Ed.2d 210 (1979); *Deltona Corp. v. United States,* 657 F.2d 1184, 228 Ct.Cl. 476 (1981); and *Jentgen v. United States,* 657 F.2d 1210, 228 Ct.Cl. 527 (1981).

Defendant's argument proves far too much. A taking through regulation invariably leaves the property owner certain incidents of ownership that, on their face, appear to be significant. For example, in *Pennsylvania Coal* the property owner was denied the right to mine coal where doing so would cause the subsidence of any dwelling. The owner retained numerous other rights: to sell, lease or give away its interest in the property; to visit the mine; to exclude all intruders and trespassers. Similarly, in *Benenson,* where plaintiffs were deprived of the right to replace the Willard Hotel with a modern office building, or to make any other significant exterior structural changes, the court noted that "plaintiffs have complete freedom to alter the interior of the building for uses other than a hotel, and [defendant] has not prohibited the sale or other use of the property." 548 F.2d at 948, 212 Ct.Cl. at 390. In *Pete,* barge owners were prohibited from conducting commercial operations on Basswood Lake, Minnesota. Plaintiffs nevertheless retained the right to exclude others from using or occupying the barges; to sell or lease them; to modify, disassemble, or destroy them; and to move them to another location. In each of these cases, the court recognized that such rights as remained to the property owner, important though they may have seemed in theory, retained little or no economic value as a result of the government's action. *See* also *Amen v. City of Dearborn,* 718 F.2d 789 (6th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984) (taking found even though landowners still had the right to live in their houses).

In cases involving regulatory takings, the court must examine the substance, rather than the legal trappings, of what is left as a result of the government's regulatory action. If that which is left to the property owner is rendered meaningless by that which is taken, compensation is due.

■ Here, the court has found that denial of the Corps permit deprived plaintiff of the only economically viable use of its property—rock mining.[6] Under such circumstances, plaintiff's remaining ownership rights, such as the right to exclude others from the property, are meaningless; plaintiff has no reason to exclude others if it cannot itself put the property to productive use. Under such circumstances, plaintiff's residual rights are hollow and cannot defeat its claim for just compensation.

### 2. *Residual Market Value*

Defendant next argues that plaintiff cannot claim a taking of its property because its land has not been rendered entirely worthless. Defendant presented evidence that there is a market for plaintiff's land and relies upon cases holding that a mere diminution in the value of property is not a taking. *Agins,* 447 U.S. at 262–63, 100 S.Ct. at 2142–43; *Andrus,* 444 U.S. at 66, 100 S.Ct. at 327; *Penn Central Transportation Co.,* 438 U.S. at 131, 98 S.Ct. at 2663; *Deltona Corp.,* 657 F.2d at 1193–94; 228

---

**6.** Defendant has suggested that plaintiff's holding the land for "long term investment," in the hope that it will eventually become available for productive use, is itself a viable economic activity. Of course, the same could have been said of the owners of the mine in *Pennsylvania Coal,* of the Willard Hotel in *Benenson* and of the unimproved land in *Althaus.* If passively holding land against the possibility that restrictions on its use will be lifted were deemed a productive economic use, property would never be rendered useless by regulation and there could be no such thing as a regulatory taking.

There may be situations where regulatory restrictions have no practical effect because the prohibited use is not economically feasible. This is not such a case. Here, plaintiff had begun to mine the property and abandoned its activities only when served with a cease and desist order by the Corps of Engineers. Plaintiff then applied for a dredge and fill permit, disclosing every intention of conducting mining activities. Under these circumstances, relegating plaintiff to passively holding the land in the hope that the regulatory climate may someday change cannot be deemed the type of viable economic use that will defeat a claim for a taking under the fifth amendment.

Ct.Cl. at 491–92; *Jentgen,* 657 F.2d at 1213, 228 Ct.Cl. at 532.

In the cases cited by defendant the property affected by the government's action continued to have significant value not merely because it could be sold for some positive price in the market, but in the more meaningful sense that it continued to be available for productive economic activity. For example, the zoning ordinance in *Agins* drastically reduced the number of dwellings that could be built on plaintiff's land. However, a significant amount of construction was in fact permitted; this constituted a profitable economic use. In *Penn Central* the Court noted that "[t]he restrictions imposed ... not only permit[ted] reasonable beneficial use of the landmark site but also afford[ed] appellants opportunities further to enhance not only the Terminal site proper but also other properties." 438 U.S. at 138, 98 S.Ct. at 2666 (footnote omitted). In contrast, plaintiff here is left without *any* economically viable use of its property and is afforded no "transfer rights" or other accommodation of its interest.

 Common sense suggests that regulatory action will never entirely eliminate the market value of the real property it affects. Land, by its nature, is timeless; government policy, indeed any particular government entity, is inherently transitory. There are invariably speculators willing to gamble that even the most severe restrictions will eventually be lifted or modified so as to render the property usable again. If the existence of such a residual market for the property could defeat a claim for a regulatory taking, no regulatory taking could ever be proved and the concept would be rendered meaningless. In fact, when courts have determined that property has been rendered unfit for economically viable activity, they have found a fifth amend-ment taking even though the property obviously continued to have market value. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Benenson v. United States,* 548 F.2d 939, 212 Ct.Cl. 375 (1977); *Pete v. United States,* 531 F.2d 1018, 209 Ct.Cl. 270 (1976); *Amen v. City of Dearborn,* 718 F.2d 789 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984); *Annicelli v. Town of South Kingstown,* —— R.I. ——, 463 A.2d 133 (1983); *Bartlett v. Zoning Commission,* 161 Conn. 24, 282 A.2d 907 (1971); *Dooley v. Zoning Commission,* 151 Conn. 304, 197 A.2d 770 (1964); *State v. Johnson,* 265 A.2d 711 (Me.1970); *Morris County Land Improvement Co. v. Township of Parsippany-Troy Hills,* 40 N.J. 539, 193 A.2d 232 (1963).

Here, the court finds that the market for plaintiff's land is based on speculation, much of it fueled by unscrupulous promoters. Southern Florida real estate attracts much investment capital, particularly from abroad. Land is sold to unwary, distant buyers on the premise that it is, or can be rendered, suitable for development. The State of Florida has recognized this as a serious problem and has taken measures to curb the practice, apparently without complete success. The existence of a market for plaintiff's property, despite what the court has found to be its uselessness for all productive activity, is based upon speculators' expectations that they will be able to pass the property on to hapless investors who do not understand the nature and scope of the restrictions on its use, or can be persuaded that the restrictions are transitory or can be circumvented.[7]

 It is well established that speculative value may not be taken into account for purposes of determining compensation

---

7. Potential buyers would require much sophistication to understand the full scope of the restrictions on the use of plaintiff's land. The FWPCA does not directly prohibit construction in wetlands, but merely requires a permit therefor. Buyers might well believe that a permit is readily obtainable. In reality, if a permit was denied plaintiff for rock mining, there is little possibility that a permit would be issued for other construction activities (such as apartment houses) which alter the character of the land and surrounding environment much more drastically.

in condemnation proceedings. *United States v. 117,763.00 Acres of Land,* 410 F.Supp. 628, 631–32 (S.D.Cal.), *aff'd sub nom. United States v. Shewfelt Investment Co.,* 570 F.2d 290 (9th Cir.1977); *accord Olson v. United States,* 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934); *United States v. 158.24 Acres of Land,* 696 F.2d 559, 562 (8th Cir.1982); *United States v. 620.00 Acres of Land,* 101 F.Supp. 686, 690 (W.D.Ark.1952). In *117,763.00 Acres of Land,* the government sought to condemn a leasehold of desert property for use as an artillery range. The property owners argued that the fair market value ought to be determined by reference to prices paid by speculators for nearby property. At the urging of the United States, the court rejected this argument noting that the prices paid by speculators did not rest upon the "appraisal of the land in terms of its uses and a forecast of what the needs of a growing and shifting population for those uses will be," but upon the fact that "each speculator buys with the thought that he can sell to another speculator at a higher price ... the whole thing [being] a game of wits with someone at the end of the trading chain losing." 410 F.Supp. at 632.

It seems eminently sensible, as well as entirely fair, to apply the same rule in inverse condemnation cases. This court has done so recently in *Althaus v. United States,* 7 Cl.Ct. 688 (1985). The author of this opinion cannot improve on Judge Mayer's terse dismissal of defendant's identical argument in *Althaus:* "[T]he court rejects the idea that the fifth amendment can be avoided by forcing citizens to sell their property to speculators at a fraction of its value." *Id.* at 695.

### 3. *Rock Mining as an Element of Value*

■ Perhaps defendant's most ingenious argument is that the court must ignore limestone mining—indeed any activity requiring a federal permit—in determining whether plaintiff has been deprived of all viable economic use of its property. Under defendant's theory, any use that is subject to governmental approval is dependent upon the consent of the government for its value and so defendant may not be charged with loss arising from the prohibition. Defendant relies upon a series of direct condemnation cases holding that the United States need not compensate a property owner for value derived from uses that the government was entitled to prevent through a power other than eminent domain. *United States v. Fuller,* 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973); *United States v. Rands,* 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); *United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956); *United States v. Cors,* 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949).

Defendant's argument badly distorts the nature and function of government in a free society where the right to own and enjoy property is a fundamental aspect of personal liberty, not a privilege dependent upon the whim of the sovereign. *See Lynch v. Household Finance Corp.,* 405 U.S. 538, 552, 92 S.Ct. 1113, 1122, 31 L.Ed.2d 424 (1972);[8] *see also Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972); *Shelley v. Kraemer,* 334 U.S. 1, 10, 68 S.Ct. 836, 840, 92 L.Ed. 1161 (1948). Under defendant's theory, the government would never be required to pay compensation for denial of a permit or, indeed, for any regulatory activity that severely limits or entirely destroys the economic uses to which property may be put. Since practically all economic activity has now been held to be the proper subject of regulation by the federal government, defendant's argument would effectively free the United States of all constitutional constraints in the area of economic regulation. This the court will not do. As Professor Epstein recently noted: "Our guiding principle should derive from our Lockean tradition—a tradition that speaks about justice

---

**8.** In *Lynch* the Court noted that "the dichotomy between personal liberties and property rights is a false one.... Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized." 405 U.S. at 552, 92 S.Ct. at 1122.

and natural rights.... When government wishes to encroach on those rights in order to discharge its collective functions, it must give all the individuals on whom it imposes its obligations a fair equivalent in exchange." Epstein, *Judicial Review: Reckoning on Two Kinds of Error*, 4 Cato J. 711, 716 (1985).

The cases defendant cites do not, in fact, support its conclusion. In *Fuller*, the property owner sought compensation for value derived from permits entitling him to graze his cattle on federal lands adjacent to the condemned land. The Court held that this element of value was not compensable because the Secretary of the Interior was authorized to withdraw the permits at will, thereby destroying the value created by their existence. 409 U.S. at 493, 93 S.Ct. at 805. In *Rands* and *Twin City Power Co.*, the Court denied compensation for losses resulting from an exercise of the "navigational servitude" of the United States. *Rands*, 389 U.S. at 126, 88 S.Ct. at 268; *Twin City Power Co.*, 350 U.S. at 228, 76 S.Ct. at 263. In each of these cases, the action of the United States was taken in its proprietary, rather than its sovereign, capacity. The rights in question belonged to the United States and were only enjoyed by the property owners subject to revocation.[9] In our case, the right to mine the property belongs entirely to plaintiff. The United States has no proprietary interest in plaintiff's land and therefore no right to prohib-

it rock mining except through exercise of its regulatory power. This is plainly not the situation contemplated in *Fuller*, *Rands* and *Twin City Power Co.*, and the United States therefore cannot escape its responsibility to pay compensation under the fifth amendment.[10]

### 4. *Taking and the Police Power*

Defendant also raises arguments to the effect that the Corps' denial of a permit cannot constitute a taking because it merely prohibits an activity "found by Congress to be detrimental to the public welfare;" because plaintiff's proposed rock mining operation would cause pollution; and because defendant is trying to protect "valuable habitat and food chain resources[,] ... values that society has historically enjoyed and may properly protect." These arguments are considered in turn.

### a. *Activity Detrimental to the Public Welfare*

■ Defendant's broadest argument is that compensation need never be paid where an activity is prohibited that has been "found by Congress to be detrimental to the public welfare." The court rejects this argument out of hand. Exercise of the police power, by definition, promotes the public good. It follows that any use prohibited under the police power is contrary to the public welfare. In essence, then,

---

9. *Cors* has no relation to this case. It stands for the proposition that the government need not compensate the owner for value created by the very use to which the government plans to put the condemned property. 337 U.S. at 333, 69 S.Ct. at 1091. Here, the value destroyed by denial of the permit was not created by the government; it is due entirely to market forces extraneous to the Corps' permitting process.

10. Defendant might have been misled by language in cases such as *Fuller* to the effect that "the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government ... might have destroyed under the exercise of governmental authority *other than the power of eminent domain*." 409 U.S. at 492, 93 S.Ct. at 804 (emphasis added). This language does not, in fact, support defendant's position. Destruction of some property rights may occur incident to a

valid exercise of regulatory authority, but where the destruction is excessive—as in this case—it is deemed to have been an exercise of the power of eminent domain as well. *See San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 653, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting) & authorities cited therein; *Sun Oil Co. v. United States*, 572 F.2d 786, 818, 215 Ct.Cl. 716, 769 (1978) ("if [government] regulation is unreasonable or arbitrary relative to private property rights, the law of eminent domain applies") (citing *Goldblatt*, 369 U.S. at 594, 82 S.Ct. at 990, and *Pennsylvania Coal*, 260 U.S. at 413–14, 43 S.Ct. at 159–60); *Althaus v. United States*, 7 Cl.Ct. 688, 693 (1985) (government actions resulted in de facto exercise of power of eminent domain). Even by its own terms, then, the statement quoted from *Fuller* has no application to this case.

defendant is arguing that an exercise of the police power can never result in a taking, regardless of how innocuous the private activity or how severely the governmental action diminishes the use and enjoyment of private property. The compensation clause of the fifth amendment would be read out of existence if government could define away private property rights by pronouncing their exercise as contrary to the public welfare.

The Supreme Court may have suggested the position urged by defendant a century ago in *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887). *Mugler* established the "noxious use" doctrine, the principle that a valid exercise of the police power that merely protects the "health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Id.* at 668–69, 8 S.Ct. at 300–01. At issue in *Mugler* was an amendment to the Kansas constitution and implementing legislation that prohibited the manufacture and sale of intoxicating liquors. Defendants, owners of breweries in operation prior to the passage of the amendment, claimed that they had been deprived of a property interest by the state without just compensation in violation of the fourteenth amendment. The Court concluded that "[t]he exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner." *Id.* at 669, 8 S.Ct. at 301.

The law has progressed significantly since *Mugler.* In *Pennsylvania Coal* the Court repudiated the proposition that an exercise of the police power can never constitute a taking, making what is perhaps

the strongest statement yet to the contrary:

> The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation.... When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.
>
> The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.

260 U.S. at 415, 43 S.Ct. at 160.

Cases since *Pennsylvania Coal* have consistently rejected the *Mugler* analysis. In *Goldblatt,* plaintiff argued that a civic ordinance preventing it from mining gravel and sand on its land, as it had in the past, was a taking in violation of the fifth amendment. The Court concluded that there had been no taking as the ordinance was a valid exercise of the police power. *Mugler* was quoted, but the Court specifically disowned the concept that "governmental action in the form of regulation cannot be so onerous as to constitute a taking which constitutionally requires compensation." 369 U.S. at 594, 82 S.Ct. at 990; *see Barbian v. Panagis,* 694 F.2d 476, 485 n. 7 (7th Cir.1982) ("[t]hough the Supreme Court has held in [*Mugler*] that an exercise of the police power may never amount to a taking, the Court has retreated from that principle in more recent decisions") (citing *San Diego Gas & Electric Co., Agins,* and *Pennsylvania Coal*). As this court recently recognized, "[w]hen the police power ventured into such areas as zoning and conservation ... this polestar [the *Mugler* analysis] disappeared over the horizon." *Morton Thiokol, Inc. v. United States,* 4 Cl.Ct. 625, 630 (1984).[11]

**11.** Speaking for an apparent majority of the Court, Mr. Justice Brennan noted as follows in

*San Diego Gas & Electric Co.:*

*Mugler* has also come under scholarly attack. In 1964 Professor Sax noted that "[t]he noxious use, cause-of-the-harm test is simply insufficient for the task" of determining when compensation must be paid under the fifth amendment. Sax, *Takings and the Police Power*, 74 Yale L.J. 36, 50 (1964). Professor Michelman notes that while "the notion that all property is held subject to an implied police-power servitude seems at one time to have been entertained by the Supreme Court [in *Mugler*]," this theory met its Waterloo in *Pennsylvania Coal*. Michelman, *Property as a Constitutional Right*, 38 Wash. & Lee L.Rev. 1097, 1108 (1981); *see also* Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv.L. Rev. 1165, 1199 n. 72 (1967) ("the accuracy, and the ingenuousness, of the Court's gratuitous word judgment [in *Mugler*] were probably questionable then, and surely have been ridiculed by history").

In short, *Mugler* was one narrow[12] attempt by the Supreme Court to deal with the problem of competing uses of land in an industrialized society. Developments over the past century have significantly weakened its precedential value. It is no longer a correct statement of the law as to the general relationship between the police power and the takings clause of the fifth amendment.

b. *Prohibition of Pollution*

Defendant suggests that *Mugler* continues to have force in the circumstances of this case because the proposed use of the property would cause pollution. Defendant argues that there is no right to use one's property so as to harm others and government may therefore prohibit such uses without paying compensation.

■ It is conceivable that government could prohibit all viable economic uses of property without paying compensation if all such uses, in fact, cause pollution. However, simple invocation of the term pollution cannot foreclose a plaintiff's right to compensation under the fifth amendment. "[M]ere labels" of this sort afford "no talismanic immunity from constitutional limitations." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Government may not circumvent the takings clause by defining an activity as pollution and rendering it noxious by fiat. Pollution, as that term is normally understood, involves serious adverse physical effects upon the health, welfare or property of others. To avoid the payment of compensation on this theory, the government must show that the prohibited activity in fact causes such harm.

■ i. Defendant first argues that plaintiff's activity constitutes pollution because it is defined as such by statute. In the FWPCA, Congress defined as pollution the dumping of "dredged and fill" material into the nation's waters. After rock is scooped out of the excavation pit during the mining process, it is placed on the adjacent wetlands. This rock falls under the definition of "dredged and fill" material and its deposit on wetlands therefore con-

---

Police power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property. From the property owner's point of view, it may matter little whether his land is condemned or flooded, or whether it is restricted by regulation to use in its natural state, if the effect in both cases is to deprive him of all beneficial use of it. From the government's point of view, the benefits flowing to the public from preservation of open space through regulation may be equally great as from creating a wildlife ref-

uge through formal condemnation or increasing electricity production through a dam project that floods private property.
450 U.S. at 652, 101 S.Ct. at 1304 (footnote omitted), *quoted in Jentgen,* 657 F.2d at 1212, 228 Ct.Cl. at 531.

12. In *Berkowitz v. United States,* 340 F.2d 168 (1st Cir.1965), the court distinguished *Mugler,* noting that, "[t]he medicines which courts administer when liquor is involved have their own peculiar emotional or, conceivably, rational elements, and are not suitable prescriptions for the generality of cases." *Id.* at 172.

stitutes pollution under the Act's definition. The evidence presented at trial, however, establishes that placing rock into the water after it has just been scooped up has no material effect upon the health, welfare or property of others. Under these circumstances, the statutory definition of pollution does not advance the analysis or automatically insulate the government's action from the takings clause of the fifth amendment.

■ ii. Defendant next argues that plaintiff's proposed mining operation constitutes pollution because it would cause contamination of the water supply. To understand this argument one must turn to certain facts disclosed at trial. The limestone that plaintiff intends to mine is part of the Biscayne Aquifer, a vast deposit of porous rock underlying southern Florida. The aquifer has the capacity to store large quantities of fresh water within its pores. Huge wellfields are dug into the aquifer from which water is extracted for human consumption. One such wellfield, known as the Northwest wellfield, is located approximately four miles northeast of plaintiff's property. Water extraction depletes the aquifer, as does the flow of water out of the aquifer toward the Atlantic Ocean. The aquifer is replenished by rainfall and through a network of canals that flow south from Lake Okeechobee in south central Florida. The canals, many of which run along public highways, are cut deep into the limestone so that the water they carry can be absorbed.

Defendant's principal contention is that the peat or muck layer in the marsh filters out various chemicals (such as phosphorus), heavy metals (such as zinc and iron) and pesticides (such as DDT) that otherwise would enter the water from the atmosphere. The peat is situated immediately above the limestone rock at the bottom of the marsh; it is generally covered by about a foot of water and is inhabited by plant and animal life.

At trial, defendant sought to establish that removal of the peat layer through rock mining would expose the aquifer to contamination. Defendant's evidence on this point was not persuasive, however, and the court finds that the peat layer does not, in fact, serve as a filter for contaminants. The most striking shortcoming of the evidence defendant presented concerning the function of the peat layer was the absence of direct empirical data. The most obvious—and effective—way to test whether the peat layer acts as a filter would have been to analyze the water above and below it. If the peat acts as a filter, the water in the aquifer below would contain fewer contaminants than the water in the marsh above. Defendant's expert admitted that such an analysis would have been effective in measuring the filtering capacity of the peat layer but gave no reason for rejecting this methodology. Nor did the expert report that he had performed any laboratory experiments to test the filtering qualities of the peat.

Instead of relying on such obvious, simple and apparently foolproof techniques, defendant's expert based his opinion entirely on the fact that certain contaminant substances were found in greater concentrations in the peat layer than in the water immediately above it. This fact does not, however, establish that the peat is currently acting as a filter. In the first place, the witness did not explain why filtration would be the only explanation for the observed higher concentrations of chemicals in the peat layer. The court cannot ignore the possibility that this higher level of contaminants in the peat may be the result of chemical or biological processes other than filtration.

More significantly, the witness admitted that even if the peat possessed filtering properties, it could not continue to act as a filter for any length of time unless there were some cleansing mechanism that removed the contaminants from the peat on a periodic basis.[13] Defendant's witness ad-

---

**13.** This is so because filters become saturated with the substances they absorb and lose their effectiveness. The need to periodically clean or change filters in swimming pools, fish tanks and

mitted that the alleged filtering action had been in process for many millenia, easily enough time to saturate the peat layer. Despite intense questioning on this point, however, the witness was unable to give a satisfactory explanation of how the peat might be purified periodically.[14] Absent such a purification mechanism, the peat would, indeed, show high concentrations of contaminants as observed by defendant's expert, but would have reached saturation and be useless in filtering out further contaminants. On this record, then, the court must reject defendant's assertion that the peat acts as a filter and that its removal during rock mining would eliminate important natural protections against atmospheric contamination of the water supply.

Defendant's expert also suggested that rock mining adversely affects water quality in another way. As described earlier, after the rock has been excavated, there remains a large, water-filled pool where the limestone has been removed. The pool is generally over 50 feet deep and can support little or no aquatic life. Sunlight can penetrate only about 20 feet beneath the surface of the pool. Without light, there is no photosynthesis; without photosynthesis, no oxygen is produced. This means that the bottom 30 feet of the pool are anaerobic and much colder than the water nearer the surface. The expert also testified that the differences in water temperature lead to stratification, which means that the water near the surface will not readily mix with the water below. Under those conditions, certain heavy metals are observed in much higher concentrations near the bottom of the pool than in the warmer, oxygenated water near the surface.[15] The witness concluded that rock mining harms water quality by creating deep water pools that cause the release of metals into the water.

The witness' testimony on this issue overlooks a number of obvious considerations. In the first place, there is no reason to assume that the anaerobic, low-temperature conditions that prevail 50 feet below the surface in open water rock pits do not also exist at the same depth within the aquifer. Indeed, while sunlight penetrates to 20 feet below the surface of a lake, it presumably does not penetrate through the peat layer at all and certainly does not pass into the rock. It seems to follow that the water within the aquifer is subject to greater anaerobic conditions and cooler temperatures than the water in a rock pit. Moreover, the peat layer and the aquifer itself would totally prevent mixing of the surface water with the water within the aquifer. This could lead to greater temperature stratification than in a rock pit where warm, oxygenated surface water may mix at least to a limited extent with the water below.

It is conceivable that something about the chemical or physical composition of the aquifer nullifies the forces that are at work within the rock pit. However, nothing in the testimony of the witness suggested that to be the case. Indeed, the witness limited his analysis to a totally irrelevant comparison between the conditions at the

air conditioning systems are illustrations of this principle.

**14.** The witness suggested that animals might feed on vegetation growing on the property (ingesting some of these chemicals) then leave the property and die elsewhere. However, as the witness recognized, this process also works in reverse, with animals feeding elsewhere and coming to die on the property, thereby depositing whatever chemicals are trapped in their bodies. The same is true of other transport mechanisms suggested by the witness: peat fires that would cause the chemicals to become airborne and fall to the ground elsewhere; detritis that would flow onto the property as quickly as

it passed out; and aquatic insect larvae that mature in one location within the peat and die elsewhere.

**15.** Defendant's expert was somewhat laconic in explaining what causes these metals to appear. As best the court can gather from the testimony, these metals are also present in warmer, oxygenated water although they may be combined with organic compounds. The absence of organic materials, together with the colder temperatures near the bottom of the pool, apparently causes these metals to be released or precipitated so that they can be separately observed and measured.

bottom of the rock pit, dozens of feet underwater, with those in the marsh, only a few inches below the surface. Surprisingly, the witness took no water samples from within the aquifer and made no comparison between heavy metal concentrations in the rock pit and in the aquifer at equivalent depths.

There is yet another problem with the expert witness' analysis. The data he presented consisted of one set of readings taken at an unidentified location within a rock pit. Even overlooking the patent unsuitability of a single sampling for any serious scientific inquiry, the reported measurement did not take into account the dynamic nature of the water within the rock pit. Defendant's own experts testified that, as the wellfields operate, the surrounding water table is lowered, causing water within the aquifer to flow towards the pumping stations. Moreover, fresh water within the aquifer naturally flows toward the ocean. At any point within the aquifer, therefore, there would be a measurable horizontal water flow in one or more directions. Depending upon the speed with which the water flowed, and the location of the measurement site, the water samples taken might or might not have reflected the chemical and physical conditions within the pool itself. For example, if the samples were taken near the upstream edge of the pool, the water retrieved could well have been recently released from the aquifer. Only by repeated, consistent readings at various locations could the witness have been reasonably sure that the samples taken were of water that had been in the pool long enough to reflect the physical and chemical conditions there.

Finally, even if one were to conclude that the water in the rock pit is different in chemical composition from that elsewhere within the aquifer, defendant's expert failed to explain how this has a detrimental effect upon the quality of the drinking water. It must be remembered that, in this portion of its case, defendant was not suggesting that the rock pit admits greater quantities of heavy metals into the water supply. *But see* pp. 172–173 *supra.* The point of the expert's analysis was that heavy metals (which presumably already exist within the water) are precipitated or released as separate, identifiable compounds. *See* p. 173 & n. 15 *supra.* The witness failed to explain, however, why heavy metals in suspension are any more unsafe for human consumption than the same heavy metals in solution or combined with organic compounds.[16]

Defendant's final argument that rock mining causes contamination is based upon the proposition that rock pits make it easier for people to contaminate the water supply by facilitating access to the water within the aquifer. There are a number of difficulties with defendant's argument on this point as well. First, the evidence at trial establishes that rock pits do not in fact increase the likelihood of contamination from toxic pollutants or other waste materials. If such substances are dumped anywhere on the wetlands covering the aquifer, they will seep through the peat layer and permeate the rock. This process might well be slower than if the contaminants were dumped in a rock pit but, according to undisputed testimony, they would eventually reach the aquifer in any event.

Second, there are already many places where the peat layer has been removed to allow direct access to the aquifer from the surface. The most notable of these are the canals used to transport water from Lake Okeechobee. The canals, many of which run along roads and highways, are cut deep into the aquifer so the flowing water can come into direct contact with the

**16.** It is worth noting that the "scientific" evidence presented was based on observations and measurements taken shortly before trial. It was not available to, and therefore was not considered by, the Corps in rendering its decision whether to issue the permit. The administrative record prepared by the Corps reveals no evidence of this sort. While the decisional document, issued October 2, 1980, notes that the peat layer serves a filtration function, the basis for this conclusion is not given. There is no discussion at all of the alleged higher concentrations of heavy metals within open rock pits.

permeable rock. There is such a canal across the highway from plaintiff's property, readily accessible to the public. By contrast, rock quarries are fenced and closely guarded. It is preposterous to suggest that someone inclined to dump contaminants would eschew the easy access and seclusion of miles of canals and thousands of acres of wetlands, and sneak into a quarry to drop them into a rock pit.

If there is a legitimate concern that contaminants might be dumped into the aquifer through a rock pit, there are methods of preventing that harm that are far less draconian than a total prohibition of rock mining on plaintiff's property. For example, issuance of the permit could well have been conditioned on providing adequate security and fencing around the pit, or on limiting future development of the property to avoid public access.

iii. Aside from the weakness of defendant's case, its position is further undermined by other evidence that strongly suggests rock mining has no negative effect on water quality. Most impressive is the fact that the area in the vicinity of plaintiff's property is littered with rock quarries, most of them much closer to the wellfields than plaintiff's property. These quarries have been in existence for many, many years, some predating the wellfields. Yet the local authorities do not hesitate to operate the wellfields, and, indeed, established them in that area despite the pervasiveness of rock mining. Furthermore, a study conducted regarding the effect of rock mining on water quality concluded that rock mining did not have an adverse impact on water quality. Even the Corps' own environmental assessment found "no definitive pattern of ground-water quality degradation or significant change in water quality" of wells in proximity to rock pits. U.S. Army Corps of Engineers, *Excavation and Use of Limestone in South Florida-Tech-*

*nical Report and Environmental Investigation*, § 1.5.6, at 1–65 (Jul. 21, 1982).[17]

Finally, plaintiff's proposed rock quarry was situated so that it would be highly unlikely that the quality of the water drawn from the wellfields would be affected. A Dade County ordinance protects the portion of the Biscayne Aquifer from which the wellfields draw their water. The ordinance is premised on a study showing the rate at which water will travel towards the wellfields in response to pumping. The study marks an outside "cone of influence," representing the farthest point in the aquifer from which water reaches the wellfields. Permits are required for development within the cone of influence. A number of rock quarries are within that cone of influence, some quite close to the wellfields. Plaintiff's proposed rock mine would have fallen entirely outside that cone of influence. Thus, water from its rock pit would never, for all practical purposes, have reached the wellfields.

On the basis of the evidence presented, the court finds that plaintiff's proposed rock mine would not have resulted in pollution of the water supply.

### c. *Destruction of "Habitat & Food Chain Resources"*

Defendant raises a separate argument that the proposed project would eliminate a substantial amount of wetlands and with them "valuable habitat and food chain resources." The evidence in fact suggests that the rock pit would seriously and permanently disrupt the wetlands on plaintiff's property. Life forms in the marsh, such as fish and amphibians on which birds feed, would diminish. Moreover, the life cycle in the marsh produces detritis, miniscule particles of organic matter that result from the decay of plant and animal remains. Surface water flow moves detritis off the property, presumably to serve as

---

17. At the same time, the assessment concludes that rock mines result in an increase in water *quantity* available for consumption. *Excavation and Use of Limestone in South Florida*, § 1.5.6,

at 1–61. This is because a pool can hold more water than can a portion of the aquifer of equal volume where much of the space is taken up by the rock itself.

nutrients elsewhere.[18] In addition, the court notes that the swamp is a place of great natural beauty, teeming with an astonishing variety of life forms. By contrast, rock pits are unsightly and barren.

Defendant argues that denial of the permit cannot constitute a taking because the public was entitled to continued enjoyment of the environmental and aesthetic values the property now generates. In defendant's view, since plaintiff had no right to deprive the public of these values by disturbing the wetland environment, it is not entitled to compensation for being prohibited from doing so.

■■■ i. Defendant's argument stands our traditional concepts of private property rights on their head. It is impossible to use one's property in a society without having some impact, positive or adverse, on others. Nevertheless, the concept of property rights presupposes that private parties have wide latitude as to how they will use what they own. This principle has its limits, of course. For example, government may prohibit uses that cause the release of substances harmful to others, such as air or water pollution. *United States v. Ashland Oil & Transportation Co.,* 504 F.2d 1317, 1328–29 (6th Cir.1974). It may also restrict property uses to promote the general welfare, so long as the owner is left with some viable economic use. *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141; *Penn Central Transportation Co.,* 438 U.S. at 138 n. 36, 98 S.Ct. at 2666 n. 36; *Goldblatt,* 369 U.S. at 594, 82 S.Ct. at 990; *Deltona Corp.,* 657 F.2d at 1192, 228 Ct.Cl. at 490; *Jentgen,* 657 F.2d at 1213–14, 228 Ct.Cl. at 533–34; *Althaus,* 7 Cl.Ct. at 698. But to accept defendant's argument that government may gratuitously freeze all development because the public has a vested right to continued enjoyment of the environmental, aesthetic or similar values generated by the property in its current state, would render the concept of private property meaningless.[19] Cf. *Pennsylvania Coal Co.,* 260 U.S. at 415, 43 S.Ct. at 160 (unlimited approval by the courts of restrictions on the use of property may cause private property to disappear).

Federal and state courts alike have been vigilant in protecting private parties from governmental action that forces them to maintain their property in an undeveloped condition. *Althaus* provides an excellent illustration. There, a series of plaintiffs claimed that the government had restricted use and development of their property. As to some plaintiffs (those whose land was already developed), the court ruled that there was no taking because the owners continued to have reasonable use of their property. *Althaus,* 7 Cl.Ct. at 698. However, as to those owners who were forced to maintain their property in an undeveloped state, the court held that there was a taking because plaintiffs were denied "the ordinary and essential uses and rights of private ownership." *Id.* at 696; *see also Drakes Bay Land Co. v. United States,* 424 F.2d 574, 191 Ct.Cl. 389 (1970) (taking found where landowner was prevented from developing its land by government officials bent on incorporating it into the Point Reyes National Seashore).

■■■ Contrary to defendant's assertion, courts do not view the public's interest in environmental and aesthetic values as a servitude upon all private property, but as a public benefit that is widely shared and therefore must be paid for by all. This concept was expressed well by the Supreme Court of Maine in *State v. Johnson,* 265 A.2d 711 (Me.1970), a case much like

---

**18.** Defendant proffered evidence that the flow of detritis from plaintiff's property makes its way to the Biscayne estuary some 12 miles away. The court excluded this evidence on the basis of surprise. In light of the court's substantive ruling, admission of this evidence would not have affected the outcome of the case in any event.

**19.** Defendant's argument was implicitly rejected by the Court of Claims in *Benenson,* 548 F.2d at 949, 212 Ct.Cl. at 392. The public's interest in continued enjoyment of the aesthetic, historical and cultural values embodied in the Willard Hotel was not a sufficient basis for denying plaintiffs compensation where this interest manifested itself in a total prohibition of any economically viable use of the property.

ours. There, as here, the landowner was denied a permit to develop wetlands. The court found a taking without just compensation, reasoning that:

> [T]he area of Wetlands representing a "valuable natural resource of the State," of which appellants' holdings are but a minute part, is of state-wide concern. The benefits from its preservation ... are state-wide. The cost of its preservation should be publicly borne. To leave appellants with commercially valueless land in upholding the restriction presently imposed, is to charge them with more than their just share of the cost of this state-wide conservation program, granting fully its commendable purpose.

265 A.2d at 716.[20] *See also Annicelli v. Town of South Kingstown,* — R.I. —, 463 A.2d 133 (1983) (ordinance designed to preserve beaches in a natural state found to work a taking); *Bartlett v. Zoning Commission,* 161 Conn. 24, 282 A.2d 907 (1971) (ordinance that forbade owner from filling marsh held a taking where objective was to avoid the destruction of wetlands); *Dooley v. Town Plan & Zoning Commission,* 151 Conn. 304, 197 A.2d 770 (1964) ("[w]here most of the value of a person's property has to be sacrificed so that community welfare may be served ... the occasion is appropriate for the exercise of eminent domain"); *Morris County Land Improvement Co. v. Township of Parsippany-Troy Hills,* 40 N.J. 539, 193 A.2d 232 (1963) (taking found where the effect of regulation was to preserve land in its natural state to act as a flood basin); *Hager v. Zoning Commission,* 261 S.W.2d 619 (Ky. 1953) (zoning regulation preserving land as a "ponding area" found to work a taking).

■ ii. Where government entirely prohibits development of property for purposes of maintaining environmental values or to serve other police power interests, it

frequently provides a remedy to compensate the owner, at least partially, for his loss. Such a remedy generally saves the provision from constitutional infirmity. For example, in *Penn Central* a city ordinance prohibited the proposed development of Grand Central Station because the project would have destroyed the terminal as a historic landmark. The ordinance, however, provided that the owners would have "transfer rights" to develop other property. In upholding the validity of the ordinance, the Court noted that the property owners' interests had been considered and a reasonable attempt had been made to accommodate them. *Penn Central Transportation Co.,* 438 U.S. at 137–38, 98 S.Ct. at 2665–66; *see also Shanghai Power Co. v. United States,* 4 Cl.Ct. 237, 246–47 (1983) (no taking where government sought to accommodate all relevant interests and its "action[s] resulted in both direct and incidental benefits to plaintiff"), *aff'd mem.,* 765 F.2d 159 (Fed.Cir.1985).

Perhaps the most apposite examples of this practice are federal statutes dealing with conservation in national parks and wilderness areas. Under the Wilderness Act, Congress sought to preserve certain areas of the United States in a natural state. The Secretary of Agriculture is directed to assure adequate access to private land surrounded by these wilderness areas, or to exchange the land for federal land of equal value. 16 U.S.C. § 1134 (1982). Similarly, the National Trails System Act provides for a system of exchange and/or monetary compensation for the acquisition of private land within a national scenic or historic trail right-of-way. 16 U.S.C. § 1246(f) (1982). The Wild and Scenic Rivers Act also allows the Secretaries of Agriculture and the Interior to acquire private land within a national wild and scenic river system by the exchange of equivalent land and/or monetary compensation. 16 U.S.C. § 1277(d) (1982).[21]

---

**20.** *State v. Johnson,* like some of the other decisions cited, was interpreting a state's constitution. The court's reasoning is nonetheless persuasive, particularly since the pertinent state constitutional provision is identical to the feder-

al one. Indeed, the court quoted Mr. Justice Holmes' opinion in *Pennsylvania Coal.*

**21.** In this regard, the Court of Appeals for the Federal Circuit has recently noted as follows:

■ Most interesting, though, is the Water Bank Act. Under this act, Congress recognized that "it is in the public interest to preserve, restore, and improve the wetlands of the Nation, and thereby to conserve surface waters, to preserve and improve habitat for migratory waterfowl and other wildlife resources." 16 U.S.C. § 1301 (1982). The Secretary of Agriculture is authorized to enter into agreements with land owners to effectuate the purposes of this act. These agreements are to provide for annual payments at rates the Secretary has determined to be fair and reasonable to compensate the landowner for conserving the wetlands on his property. 16 U.S.C. § 1304 (1982). Defendant is no doubt correct in arguing that the nation has an interest in preserving the environmental and aesthetic values represented by wetlands. The question is: How are these benefits to be paid for? As Mr. Justice Brennan recognized in *San Diego Gas & Electric Co.*, "[f]rom the government's point of view, the benefits flowing to the public from preservation of open space through regulation may be equally great as from creating a wildlife refuge through formal condemnation." 450 U.S. at 652, 101 S.Ct. at 1304. However, Congress recognized in the Water Bank Act that the public may enjoy the benefits of undisturbed wetlands only by paying compensation to the property owner who is thereby deprived of the use of his land.[22]

■ What these regulatory schemes have in common is that in each case the property owner's interest has been considered and accommodated, not sacrificed on the altar of the public interest. By contrast, the regulatory scheme pursuant to which plaintiff's land was rendered economically useless provides for no accommodation whatsoever of plaintiff's right to use and enjoy its property. In determining whether to issue plaintiff a permit, the Corps did not so much as consider plaintiff's obvious interest. The permitting process, which lasted 12 months, involved a thorough study of the *public* impact of the proposed rock mining project. Comments were requested and received from numerous federal, state and local agencies engaged in protection of environmental resources. The decisional document, issued October 2, 1980, reviewed these comments and then considered 14 separate "Public Interest Factors," which included such matters as the effect of the proposed project on fish and wildlife, aesthetics and the economy. The project was found to have many adverse effects. The only beneficial effects the Corps found were enhancement of the economy, expansion of job opportunities and stimulation of competition. The Corps minimized the significance of these positive factors by noting that rock mining permits had been issued to some of plaintiff's competitors, this in the Corps' view providing sufficient alternative sources of limestone, as well as sufficient employment and competition.[23] That denial of the per-

Where the question is whether a regulation not meant to take an interest in land is so onerous as to effect a taking by imputation, and with no provision for money compensation, the availability of substitution rights may be important in determining whether the regulation is something the landowner can live with without unfairness.
*Whitney Benefits, Inc.*, 752 F.2d at 1557.

**22.** This expression of congressional policy is not without significance in determining whether the government's action here amounts to a taking. In *Drakes Bay Land Co.*, involving the creation of the Point Reyes National Seashore in California, the court found a taking, specifically noting that "Congress enacted [the Point Reyes National Seashore Act] requiring and expecting that an equitable acquisition program would be effect-

ed." 424 F.2d at 582, 191 Ct.Cl. at 404. In *Althaus*, this court recently found a taking where land was kept in its natural state in anticipation of its acquisition for a national park, noting: "Congress reflected its appreciation of the fifth amendment by requiring that an equitable acquisition program be used with reasonable promptness at Voyageurs [National Park]. *Althaus*, 7 Cl.Ct. at 696.

**23.** The permits approved by the Corps were for rock mining in an area east of the Dade-Broward levee, a local landmark. The Corps denied plaintiff's permit pursuant to what the court finds to have been a deliberate, but unannounced, policy of "zoning" the area west of the Dade-Broward levee, north of the Tamiami Trail and east and south of Krome Avenue as undis-

mit would visit grave economic harm upon plaintiff, harm that is only aggravated by issuance of mining permits to its competitors, was not so much as mentioned in the Corps' memorandum of decision.

The court, suggests no wrongdoing or dereliction of duty in the Corps' failure to consider plaintiff's private loss in its decision on whether to issue a permit. Plaintiff has conceded the validity of the permitting process and does not claim that the Corps considered impermissible factors or failed to consider factors it should have. It is therefore deemed established that the Corps scrupulously followed the regulatory scheme in its consideration and denial of plaintiff's application. The process itself, however, is geared to take into account only the public's interests in how the property will be used; the owner's private interest is ignored. The difficulty arises because the property in question does not belong to the public but to plaintiff. It may be perfectly appropriate to consider only public interest factors when determining the use of public land. However, when government treats private land as if it were its own, ignoring the interest of the property owner and rendering the property economically useless, it has worked a taking and, under our constitution, compensation is due.

### 5. *The Power of the Federal Government Over Navigable Waterways*

■ Defendant's final argument is that denial of the permit is not a compensable taking because it is an exercise of the federal government's power to regulate the nation's waterways. In defendant's view, Congress may prohibit, without compensation, all "private activities which pollute, degrade, or diminish the waters of the United States and their alternate resources."

This argument adds nothing to the analysis in light of the issues already resolved by the court. The fact that plaintiff's proposed mining operation would involve wetlands does not by some peculiar alchemy protect the government from the fifth amendment's takings clause any more than the other incantations it has invoked. As the Supreme Court noted in *Kaiser Aetna*, "[r]eference to the navigability of a waterway adds little if anything to the breadth of Congress' regulatory power over interstate commerce." 444 U.S. at 173, 100 S.Ct. at 389. Even when the property in question is a navigable waterway, the United States may be required to pay compensation where it unduly interferes with the property owner's right to use and enjoy its property. *Id.* at 175–79 & n. 10, 100 S.Ct. at 390–93 & n. 10. This reasoning applies a fortiori where plaintiff's property is concededly not a navigable waterway and where the Corps' action was not taken to improve navigation.[24] To the extent denial of the permit is otherwise deemed a taking, it will not be converted into something else because water happens to be involved.

### Conclusion

Denial of the dredge and fill permit by the Corps of Engineers constituted a taking of plaintiff's property for which compensation is due. The taking occurred on October 2, 1980, the date the permit was denied. The amount of compensation to which plaintiff is entitled will be determined in further proceedings.

---

turbed wetlands where no significant development would be permitted.

**24.** In denying plaintiff's permit application, the Corps noted that there were no applicable navigation concerns. Finding of Fact and Environmental Assessment on Permit Application 79P–1334, at 7 (Oct. 2, 1980).